REYNOLDS HEALTH CARE SERVICES, INC. *v.*
HMNH, INC.;  James M. Sheppard;  F. Courtney Sheppard;
L. Andrew Sheppard;  and Eugene E. Bilo, Jr.

04-1009                                          217 S.W.3d 797

Supreme Court of Arkansas
Opinion delivered November 17, 2005

[Rehearing denied January 5, 2006.]

*Rose Law Firm*, by: *W. Dane Clay* and *Michael R. Shannon*; and *Barrett & Deacon, P.A., by: D.P. Marshall Jr., Andy L. Adams,* and *Andrew H. Dallas*, for appellant.

*Compton, Prewett, Thomas & Hickey, LLP*, by: *Floyd M. Thomas, Jr.*, for appellees.

Tom Glaze, Justice. The Hillsboro Manor Nursing Home in El Dorado was formerly owned by the Reynolds family. Mr. and Mrs. Reynolds were the sole stockholders in the nursing home, and their son, John Reynolds, became the administrator of the facility in 1979. Reynolds purchased the nursing home from his parents in 1991, and in 1992, he decided to expand the nursing home. However, he needed additional capital, so he approached Dr. James Sheppard, who expressed interest. The doctor, in turn, contacted three additional investors: his two brothers and his brother-in-law, appellees Andrew Sheppard, Courtney Sheppard, and Eugene Bilo.

The Sheppards and Bilo formed a corporation called HMNH, Inc., in order to acquire Hillsboro Manor. On January 7, 1993, HMNH, Inc. and Reynolds Health Care Services, Inc. (RHCS), a corporation in which John Reynolds was the sole shareholder, entered into an agreement to provide management services. Under that management agreement, RHCS agreed to manage the nursing home by hiring an administrator, developing budgets, developing policies and procedures, and providing the highest standards of patient care in accordance with all applicable

laws. HMNH agreed to provide adequate working capital and oversight on budgets, policies, and personnel; in addition, HMNH agreed to pay RHCS six percent of gross revenues for management services. RHCS hired John Reynolds as administrator of the facility.

Also in January of 1993, HMNH and Hillsboro Manor Nursing Home, Inc. entered into a stock purchase agreement by which HMNH purchased all of the stock of Hillsboro Manor Nursing Home, Inc., for $1,804,000. On the same day, the parties entered into a merger agreement by which Hillsboro Manor Nursing Home, Inc. was merged into HMNH, Inc. Under the agreement, the shares of Hillsboro Manor and HMNH, Inc. converted into shares of HMNH, Inc. The Sheppards, Bilo, and Reynolds Health Care Services, Inc. each received a certificate for twenty shares of stock, accounting for each of the one hundred outstanding shares of stock in HMNH.

Although the arrangements operated smoothly for some years, by 1999, HMNH had become concerned with the way Reynolds was running the nursing home; in addition, Reynolds began to express his concerns that HMNH was failing to provide working capital. Also around September of 1999, the Department of Human Service's Office of Long Term Care (OLTC) began an investigation, which was prompted by the death of a resident. OLTC conducted a survey at the nursing home on December 16, 1999, after which OLTC issued a report in which it found that the facility was not in substantial compliance with numerous federal laws and regulations.

In January of 2000, the federal Department of Health and Human Services (DHHS) terminated the nursing home's Medicare/Medicaid agreement. In March of 2000, OLTC informed Reynolds that the agency intended to terminate Hillsboro Manor's license to operate. Ultimately, DHHS imposed civil penalties of $126,300 for the violations of federal law that occurred between November 11, 1999, and May 18, 2000; those penalties were eventually reduced to $43,315.

At a March 2000 stockholders' meeting at which the Sheppards and Bilo were present, but Reynolds was absent, the stockholders concluded that the management agreement between HMNH and RHCS had been breached and should be terminated. The shareholders held a meeting on September 14, 2000, but again, Reynolds was absent from the meeting. At the September

meeting, the Sheppards each voted their combined sixty shares to elect a new board of directors; the new board consisted of the three Sheppards, Bilo, and Reynolds. At the directors' meeting, held immediately thereafter, the five men were elected as officers of HMNH, although Reynolds abstained from the vote. Andrew Sheppard then made a motion that the board of directors authorize its attorney to institute a lawsuit in the name of HMNH against John Reynolds and RHCS to recover damages caused by RHCS's breach of the management contract. The Sheppards and Bilo voted to adopt the resolution.

On January 19, 2001, HMNH filed suit against RHCS and Reynolds, alleging that RHCS had breached the management contract. Reynolds and RHCS answered and filed a counterclaim, contending that HMNH had failed to pay RHCS the agreed-upon management fee and had failed to maintain a sufficient amount of operating capital. The matter eventually went to a bench trial in Union County Circuit Court, and the circuit court entered an order finding RHCS in material breach of the management agreement. The trial court awarded HMNH damages in the following amounts: $43,315, a result of the civil penalties imposed by DHHS; $80,698, the lost revenue from the termination of Medicare/Medicaid agreements; and $168,000, or half of the lost revenue occasioned by the bad publicity surrounding the government surveys and lawsuits. However, the court also found that HMNH had breached its agreement to pay a management fee, and awarded RHCS $123,648.50. Thus, RHCS's damages due to HMNH were reduced to $168,365.

On appeal, RHCS raises two points for reversal. It argues that the trial court erred in 1) refusing to enforce the parties' voting agreement, and 2) awarding consequential damages to HMNH.

To address RHCS's first issue requires this court to determine the applicability of Ark. Code Ann. § 4-27-731 (Supp. 2001). The question of the correct interpretation and application of an Arkansas statute is a question of law, which this court decides *de novo. See Cooper Realty Investments, Inc. v. Arkansas Contractors Licensing Bd.*, 355 Ark. 156, 134 S.W.3d 1 (2003); *Wal-Mart Stores, Inc. v. P.O. Market, Inc.*, 347 Ark. 651, 66 S.W.3d 620 (2002).

Ark. Code Ann. § 4-27-731, a statute that has not previously been interpreted by this court, provides as follows:

> (a) Two (2) or more shareholders may provide for the manner in which they will vote their shares by signing an agreement for that

purpose. A voting agreement created under this section is not subject to the provisions of § 4-27-730.

(b) A voting agreement created under this section is specifically enforceable.

This statute was adopted as part of Act 958 of 1987 by the General Assembly as part of the Arkansas Business Corporation Act, and the language used therein was taken from the Model Business Corporation Act. The "Historical Background" information that accompanies the Model Act provides the following discussion:

> A voting agreement (sometimes called a pooling agreement) is an agreement among shareholders relating to the voting of shares; it is primarily used as a means to effect a specific allocation of representation on the board of directors of a closely held corporation. It differs fundamentally from a voting trust, which involves a transfer of the legal title of shares to the trustees and a change in the record ownership of the shares.

Model Bus. Corp. Act § 7.31 (Supp. 1996).

American Jurisprudence discusses voting agreements, in relevant part, as follows:

> Voting, or, as they are sometimes called, pooling agreements among stockholders are characteristically contracts designed to combine votes with a view to concerted action for a common object, and which control the votes of one or more of the parties by limiting their voting rights or conferring them upon others. . . .
>
> A voting agreement is also distinguished from an irrevocable proxy in that it does not necessarily result in the creation of an agency relationship, and need not involve the use of a proxy to effectuate it. However, the line of demarcation is not always clear, and some voting agreements have been treated as irrevocable proxies.

18A Am. Jur. 2d *Corporations* § 944 (2004). *See also* 18 C.J.S. *Corporations* § 379 (1990).

In a broad sense, the term "shareholders' agreement" refers to any agreement among two or more shareholders regarding their conduct in relation to the corporation whose shares they own. *See*

*Blount v. Taft*, 295 N.C. 472, 480-81, 246 S.W.2d 763, 769 (1978). Such agreements are generally utilized in closely held corporations, and they may be used to guarantee to a minority shareholder "such things as restrictions on the transfer of stock; a veto power over hiring and decisions concerning salaries, corporate policies or distribution of earnings; or procedures for resolving disputes or making fundamental changes in the corporate charter." *Blount*, 295 N.C. at 482, 246 S.E.2d at 770. *See also Weil v. Beresth*, 154 Conn. 12, 220 A.2d 456 (1966).

Shareholder or voting agreements differ from proxies in that a proxy is simply an "authority given by the holder of the stock who has the right to vote it to another to exercise the holder's voting rights." 18A Am. Jur. 2d *Corporations* § 902; *see also Black's Law Dictionary* 1263 (8th ed. 2004) (proxy defined as "[o]ne who is authorized to act as a substitute for another; esp., in corporate law, a person who is authorized to vote another's stock shares"). Thus, a proxy differs from a voting agreement in that the former gives another person the authority to vote one's shares, while the latter purports to direct how the other person is to vote.

RHCS argues that it entered into a voting agreement with the Sheppards and Bilo in 1993 when they signed a document titled "Option to Purchase Stock"; in particular, RHCS points to the following language in support of its contention that a voting agreement was created:

> [HMNH] shall grant to [RHCS] a proxy to vote one-half of the issued and outstanding shares of stock of HMNH, Inc. pending the term of this option to purchase stock, which proxy shall be reduced to twenty-five percent of the issued and outstanding shares of stock of the corporation for a period of twenty years from the effective date of the Agreement to Provide Management Services to a Health Care Facility executed the 8th day of January, 1993, as set forth in paragraph IV thereof, by and between Reynolds Health Care Services, Inc., and HMNH, Inc., upon the exercise of this option and transfer to [RHCS] of the shares of stock subject to this option.

A subsequent agreement among the shareholders, dated September 19, 1996, provided that the Sheppards and Bilo "shall execute a proxy to Reynolds Health Care Services, Inc., appointing Reynolds Health Care Services, Inc. as [their] proxy to vote 7.5 shares of each of the said shareholder's stock held in HMNH, Inc." Those proxies were executed by each of the Sheppards and Bilo on October 21, 1996; the proxy agreements provided as follows:

> I, the undersigned shareholder of HMNH, Inc., an Arkansas corporation, do hereby appoint Reynolds Health Care Services, Inc., an Arkansas corporation, my true and lawful attorney and agent, for me and in my name, place and stead to vote as my proxy 7.5 shares of stock held by me in HMNH, Inc. at any stockholders' meetings to be held between the date of this proxy and 20 years from the effective date of the Agreement to Provide Management Services to a Health Care Facility dated January 7, 1993, as set forth in Paragraph IV thereof, by and between Reynolds Health Care Services, Inc., and HMNH, Inc., and I authorize Reynolds Health Care Services, Inc. to act for me and in my name and stead as fully as I could act if I were personally present, giving to Reynolds Health Care Services, Inc., attorney and agent, full power of substitution.

The trial court found that these agreements were not voting agreements, but rather were revocable proxies. Under Ark. Code Ann. § 4-27-722 (Repl. 2001), proxies are revocable by a shareholder "unless the appointment form conspicuously states that it is irrevocable and the appointment is coupled with an interest." § 4-27-722(d). An appointment coupled with an interest includes the appointment of "a party to a voting agreement created under § 4-27-731." § 4-27-722(d)(5). None of the proxy agreements stated conspicuously on its face that it was irrevocable; indeed, in its reply brief, RHCS abandons its argument that the proxies were irrevocable. Nonetheless, RHCS maintains that the proxies "were merely the means of implementing the parties' foundational voting agreement," by which the Sheppards and Bilo gave RHCS the right to vote fifty percent of their shares in HMNH for twenty years.

However, we conclude that the document that RHCS calls a "voting agreement" is nothing more than a revocable appointment of proxy. The plain language of the agreement says nothing about how the stock is to be voted; it merely gives RHCS the right to vote a percentage of the stock. Because the agreement does not "provide for the manner in which" the shares are to be voted, it is not a voting agreement; it is a proxy.

Further, the proxies assigned to RHCS were revocable. Thus, the Sheppards and Bilo were acting within their rights as shareholders when they voted to revoke their proxies at the September 2000 shareholders' meeting. Accordingly, the trial court did not err when it concluded that the actions of the duly elected board of directors in voting to authorize the instant lawsuit were valid.

In its second point on appeal, RHCS argues that the trial court erred in awarding HMNH consequential damages for RHCS's breach of contract.[1] The trial court found that, due to RHCS's breach of the management agreement, HMNH was entitled to damages from RHCS, as follows: 1) $43,315, the amount of the civil penalties imposed by DHHS's Health Care Financing Administration for violations of federal law that occurred at the facility between November 11, 1999, and May 18, 2000; 2) $80,698, the amount of the revenue the facility lost due to the denial of Medicare and Medicaid payments for new admissions during the period of February 4, 2000, through May 18, 2000; and 3) $168,000, one-half of the revenue lost due to the reduction in the nursing home's census as a result fo the bad publicity associated with the poor surveys and lawsuits that were filed against the facility. RHCS contended below, and now argues on appeal, that it never agreed, either expressly or tacitly, to pay any consequential damages that might result from any breach of the management agreement.[2]

Consequential damages are those damages that do not flow directly and immediately from the breach, but only from some of the consequences or results of the breach. *See Bank of America N.A. v. C.D. Smith Motor Co.*, 353 Ark. 228, 106 S.W.3d 425 (2003); *Dawson v. Temps Plus, Inc.*, 337 Ark. 247, 987 S.W.2d 722 (1999). Lost profits are well recognized as a type of consequential damages. *C.D. Smith Motor Co., supra; Smith v. Walt Bennett Ford, Inc.*, 314 Ark. 591, 864 S.W.2d 817 (1993). In order to recover consequential damages in a breach of contract case, a plaintiff must prove more than the defendant's mere knowledge that a breach of contract will entail special damages to the plaintiff. It must also appear that the defendant at least tacitly agreed to assume responsibility. *C.D. Smith Motor Co., supra; Morrow v. Hot Springs First Nat'l Bank*, 261 Ark. 568, 550 S.W.2d 429 (1977); *Hooks Smelting Co. v. Planters' Compress Co.*, 72 Ark. 275, 79 S.W. 1052 (1904).

Parties may expressly agree to be responsible for consequential damages, as this court noted in passing in *C.D. Smith Motor Co. See C.D. Smith Motor Co.*, 353 Ark. at 241. However, in the

---

[1] RHCS does not argue on appeal that there was insufficient evidence to support the trial court's findings that it breached its contract with HMNH.

[2] By failing to argue that the damages awarded to it were anything other than consequential damages, HMNH appears to concede that all damages awarded were consequential in nature.

absence of such an express contract to pay such special damages, the facts and circumstances in proof must be such as to make it reasonable for the judge or jury trying the case to believe that the party at the time of the contract tacitly consented to be bound to more than ordinary damages in case of default on his part. *Id.* (quoting *Hooks Smelting,* 72 Ark. at 286-87); *see also Bankston v. Pulaski County School Dist.,* 281 Ark. 476, 480, 665 S.W.2d 859, 862 (1984).

█ Here, there was no express agreement that RHCS would be liable for any consequential damages that might stem from RHCS's breach of the management agreement. HMNH attempts to argue that there was such an express agreement, contending that RHCS expressly agreed in its management contract with HMNH that it would be "held liable for its own acts and omissions." However, HMNH has taken this language out of context. The portion quoted is taken from Paragraph XII, which deals with "Manager as Independent Contractor"; the full paragraph provides as follows:

> Manager [RHCS] shall not be deemed to be an employee or agent of Owner [HMNH] in performing its duties hereunder. Rather, Manager shall be an independent contractor and as such shall be liable for its own acts and omissions and shall not in any way be liable for the acts and omissions of Owner, its agents, servants, or employees. Accordingly, each party shall indemnify and hold harmless the other from any liability which it may incur as a result of the negligence or willful misconduct of the other party.

This provision deals only with liability for negligence and willful conduct, not breach of contract. As such, RHCS did not expressly agree to be liable for consequential damages flowing from a breach of the management agreement.

The next question, then, is whether RHCS tacitly agreed to be liable for consequential damages. This court discussed the "tacit-agreement test" in detail in *C.D. Smith Motor Co., supra,* first noting that the test had been adopted in the 1904 *Hooks Smelting* case and further addressed in *Morrow v. First National Bank, supra.* Under that two-prong test, the plaintiff must prove more than the defendant's mere knowledge that a breach of contract will entail special damages to the plaintiff; it must also appear that the defendant at least tacitly agreed to assume responsibility. *Morrow,* 261 Ark. at 570. In discussing the rationale of the tacit-agreement

test, the *Morrow* court, as well as the *C.D. Smith Motor Co.* court, relied heavily on the *Hooks Smelting* decision, which held as follows:

> It seems then that mere notice is not always sufficient to impose on the party who breaks a contract damages arising by reason of special circumstances[.]
>
> [W]here the damages arise from special circumstances, and are so large as to be out of proportion to the consideration agreed to be paid for the services to be rendered under the contract, it raises a doubt at once as to whether the party would have assented to such a liability had it been called to his attention at the making of the contract unless the consideration to be paid was also raised so as to correspond in some respect to the liability assumed. To make him liable for the special damages in such a case, there must not only be knowledge of the special circumstances, but *such knowledge "must be brought home to the party sought to be charged under such circumstances that he must know that the person he contracts with reasonably believes that he accepts the contract with the special condition attached to it." In other words, where there is no express contract to pay such special damages, the facts and circumstances in proof must be such as to make it reasonable for the judge or jury trying the case to believe that the party at the time of the contract tacitly consented to be bound to more than ordinary damages in case of default on his part.* [Citations omitted.]

*C.D. Smith Motor Co.*, 353 Ark. at 240-41 (quoting *Hooks Smelting*, 72 Ark. at 286-87 (emphasis added in *C.D. Smith Motor Co.*)).

The question of whether notice of any such special circumstances was given to the breaching party is a question of fact. *C.D. Smith Motor Co.*, 353 Ark. at 243. This court has held that, in determining the reasonable contemplation of the parties, it is proper to consider the nature and purpose of the contract and the attending circumstances known to the parties at the time the contract was executed. *See Miles v. American Ry. Express Co.*, 150 Ark. 114, 233 S.W. 930 (1921) (citing *Hooks Smelting, supra*). Thus, we must look to the evidence before the trial court to determine if there were sufficient facts from which that court could have concluded that HMNH, at the time of executing the management agreement, made RHCS aware of any special circumstances that would render RHCS liable for consequential damages.

As previously discussed, the consequential damages in this case were awarded in three "categories": 1) civil penalties; 2) revenue lost due to the denial of Medicare/Medicaid payments;

and 3) lost revenue due to the reduction in census due to bad publicity. RHCS argues that in none of these categories was there any evidence that it tacitly agreed to being liable for potential penalties or lost profits, nor did HMNH ever "bring home" to RHCS the knowledge of special circumstances that would put RHCS on notice that it would be liable for such damages.

With regard to the civil penalties, RHCS points out that the parties' course of dealing demonstrates that there was "substantial uncertainty" as to who would pay any penalties that might arise from a survey of the facility by OLTC. For instance, RHCS notes that, on at least one occasion, HMNH, Inc., rather than the then-administrator, paid a penalty assessed by OLTC. David Lewis, who became administrator of the facility after Reynolds was removed, testified that, although he took responsibility for problems that were discovered during surveys by OLTC, the administrator was not responsible for paying any fines for which the nursing home might be found liable. Lewis also noted that HMNH, as owner of the facility, paid the fines assessed as a result of a November 2000 survey. No other testimony was presented regarding whether the parties intended Reynolds or RHCS to be liable to HMNH in the event penalties were assessed against the nursing home as the result of an OLTC survey. As such, there was no evidence that HMNH ever put RHCS on notice that it would be liable for consequential damages in the form of civil penalties.

The next two "categories" of damages both involve losses of profits: first, from revenue lost due to the termination of the Medicare/Medicaid program; and second, from revenue lost due to bad publicity and the resulting decrease in patients at the facility. Lost profits are recognized as a type of consequential damages. *See Dawson v. Temps Plus, Inc.*, 337 Ark. 247, 987 S.W.2d 722 (1999); *Smith v. Walt Bennett Ford, Inc.*, 314 Ark. 591, 864 S.W.2d 817 (1993). In support of its contention that RHCS was properly held liable for the lost revenue, HMNH argues that the Sheppards and Bilo 1) relied on Reynolds's representations that he had the knowledge and experience necessary to run a nursing home, and 2) made it clear that Reynolds would be responsible for the day-to-day operation of the facility. HMNH asserts that Reynolds knew that the Sheppards and Bilo had no experience in the nursing home industry; it further contends that the shareholders made their agreement with Reynolds conditional on Reynolds's operation of the facility in accordance with all federal, state, and local laws, rules, and regulations. HMNH further asserts that, because RHCS

and Reynolds knew that HMNH's shareholders had no experience in the nursing home industry, RHCS agreed to such conditions and responsibilities and held itself out to have the expertise to manage the facility in accordance with the stockholders' demands. HMNH concludes that this knowledge was "brought home" to Reynolds, as evidenced by his testimony that his responsibilities as administrator were to offer day-to-day operations of the facility and be primarily responsible for the financial performance of the facility.

RHCS agrees that the proof established 1) knowledge on the part of RHCS and Reynolds that they had more expertise in managing a nursing home than any of the other HMNH shareholders, and 2) knowledge that those shareholders were depending on RHCS and Reynolds to do their best in operating Hillsboro Manor. However, RHCS urges, more than mere knowledge is required; there must be some evidence establishing RHCS's tacit agreement to be liable for any profits lost as a result of patient care or management problems.

C.D. Smith Motor Co., supra, is the only recent case in which this court found sufficient evidence to support a conclusion that the defendant had been put on notice that it would be liable for lost profits. There, C.D. Smith Motor Co., a used car dealership, had established a recourse-financing relationship over the years with Bank of America. In November of 1996, the Bank and Smith signed a "Recourse Chattel Paper and Security Agreement," although the Bank reduced Smith's recourse-financing limit; the bank eventually phased out its recourse-financing program, and, as a result, terminated Smith's November 1996 agreement. Smith went out of business within a year, and sued the Bank for breach of its contract.

In holding that there was sufficient evidence that the Bank had tacitly agreed to be liable for any special damages arising from the breach of contract, this court noted that Smith testified that, when he signed the 1996 contract, he told the Bank's vice president for commercial lending, Dwayne Johnson, "If you don't honor that contract, I am going to hold the Bank responsible." C.D. Smith Motor Co., 353 Ark. at 243. Moreover, the Bank's president, David Moore, testified that he "believed Smith may have told Dwayne Johnson, upon signing the November 12, 1996, agreement, that Smith would look to the Bank for compensation if his business was destroyed." Id.

This court concluded that, because the Bank had knowledge or notice of special circumstances which could cause special

damages to follow if the contract were broken, the fact that the Bank accepted the contract under such circumstances constituted sufficient evidence to support a finding by the jury that the Bank did so knowing that, in the event of its failure to perform its contract, C.D. Smith would reasonably expect that the Bank should make good the loss incurred by reason of the special circumstances when such loss flowed naturally from the breach of contract. *Id.*

In the instant case, in sharp contrast to *C.D. Smith Motor Co.*, there is no such evidence that Reynolds or RHCS was specifically made aware of any special circumstances that would cause it to be liable for consequential damages. There were no facts presented to the trial court from which it could reasonably conclude that RHCS tacitly agreed to accept the management agreement, knowing that it would have to pay for any lost profits that might result from patient care or management problems. This conclusion is reinforced by the fact that the management agreement specifically provided that Reynolds and RHCS did not guarantee that the operation of the facility would be profitable. As such, the trial court erred in awarding HMNH consequential damages.

In its next argument on appeal, RHCS further argues that, although the trial court determined that HMNH owed RHCS $123,648.50 in unpaid management fees, the court nonetheless erroneously denied RHCS's request for prejudgment interest. Prejudgment interest is compensation for recoverable damages wrongfully withheld from the time of the loss until judgment. *Perkins v. Cedar Mountain Sewer Improvement District*, 360 Ark. 50, 199 S.W.3d 667 (2004); *Ozark Unlimited Resources Co-op., Inc. v. Daniels*, 333 Ark. 214, 969 S.W.2d 169 (1998). Prejudgment interest is allowable where the amount of damages is definitely ascertainable by mathematical computation, or if the evidence furnishes data that makes it possible to compute the amount without reliance on opinion or discretion. *Ray & Sons Masonry v. United States Fidelity & Guaranty Co.*, 353 Ark. 201, 114 S.W.3d 189 (2003); *Woodline Motor Freight, Inc. v. Troutman Oil Co.*, 327 Ark. 448, 938 S.W.2d 565 (1997). This standard is met if a method exists for fixing the exact value of a cause of action at the time of the occurrence of the event that gives rise to the cause of action. *Dugal Logging, Inc. v. Arkansas Pulpwood Co.*, 66 Ark. App. 22, 988 S.W.2d 25 (1999). Where prejudgment interest may be collected at all, the injured party is always entitled to it as a matter of law. *TB*

of *Blytheville v. Little Rock Sign & Emblem*, 328 Ark. 688, 946 S.W.2d 930 (1997); *Wooten v. McClendon*, 272 Ark. 61, 612 S.W.2d 105 (1981).

RHCS argues that it presented sufficient testimony to prove the amount of damages it suffered in the form of unpaid management fees. According to the management agreement, RHCS was entitled to retain as a monthly management fee six percent of the gross revenues generated each month by the facility; gross revenues was defined as "all revenues generated by the facility less any Medicare or Medicaid adjustments." At trial, RHCS presented the testimony of its accountant, Carolyn Merritt, who testified that she prepared a balance sheet showing the management fees owed by HMNH to RHCS. Her calculations reflected that HMNH owed RHCS $123,648.50. Thus, RHCS argues, it proved that the precise amount it was owed was definitely ascertainable by mathematical computation from the moment HMNH incurred this obligation.

HMNH responds by pointing to Merritt's testimony on cross-examination, wherein she stated that there was no figure on her analysis that represented gross revenue, according to the definition of that term in the management agreement. She then testified that the exhibit did not reflect any Medicare or Medicaid adjustments, and thus did not show the proper amount of money owed. However, RHCS notes, Merritt was subsequently recalled to testify later in the trial, and she then clarified that the deposits depicted in her exhibit did take into account the adjustments for Medicare and Medicaid, and that the exhibit actually reflected gross receipts, "net of Medicare and Medicaid adjustments."

It is axiomatic that this court gives due deference to the trial court's superior position to determine the credibility of witnesses and the weight to be accorded to their testimony. *Carson v. Drew County*, 354 Ark. 621, 128 S.W.3d 423 (2003). Here, the trial court clearly believed that Merritt's figures were valid, as RHCS won damages for unpaid management fees based on her testimony. However, as noted above, where prejudgment interest may be collected at all, the injured party is always entitled to it as a matter of law. *TB of Blytheville*, 328 Ark. at 697. The trial court's refusal to award prejudgment interest was in error.

As a final point, we note that HMNH has asked this court to dismiss RHCS's appeal on the grounds that RHCS has voluntarily satisfied the judgment against it. After the trial court entered its

order denying the parties' motions to amend findings of fact and conclusions of law on February 25, 2004, the circuit clerk issued a writ of execution to the Union County Sheriff on April 5, 2004, directing the sheriff to recover property from RHCS sufficient to satisfy the judgment. On April 13, 2004, the Union County Sheriff filed a certificate of levy indicating that he had levied on property belonging to RHCS; in addition, the sheriff filed a "certificate of officer making levy on shares of stock in a corporation," which provided that the sheriff levied on twenty shares of HMNH stock registered in the name of RHCS. The Return of Execution was filed on May 14, 2004. A sheriff's sale was held on June 4, 2004, at which time the twenty shares of stock were sold to Eugene Bilo for $175,000. On July 2, 2004, the circuit court entered an order finding that the proceeds of the sale of the stock had been applied to the judgment, and that the judgment had been satisfied in full.

In its brief, HMNH argues that, because the judgment has been satisfied, this court should dismiss RHCS's appeal. In doing to, HMNH relies on *Lytle v. Citizens Bank of Batesville*, 4 Ark. App. 291, 630 S.W.2d 546 (1982), in which the court of appeals wrote the following:

> Some jurisdictions hold that the payment of a judgment under any circumstances bars the payer's right to appeal. However, in the majority of jurisdictions, the effect of the payment of a judgment upon the right of appeal by the payer is determined by whether the payment was voluntary or involuntary. In other words, if the payment was voluntary, then the case is moot, but if the payment was involuntary, the appeal is not precluded. The question which often arises under this rule is what constitutes an involuntary payment of a judgment. For instance, in some jurisdictions the courts have held that a payment is involuntary if it is made under threat of execution or garnishment. There are other jurisdictions, however, which adhere to the rule that a payment is involuntary only if it is made after the issuance of an execution or garnishment. Another variation of this majority rule is a requirement that if, as a matter of right, the payer could have posted a supersedeas bond, he must show that he was unable to post such a bond, or his payment of the judgment is deemed voluntary. [Citations omitted.]

> We adopt the majority rule as the better reasoned rule. Thus, if appellant's payment was voluntary, then the case is moot, but if the payment was involuntary, this appeal is not precluded. In applying this rule to the facts at bar, we must determine whether the payment

made by appellant was voluntary or involuntary. In doing so, we believe that one of the most important factors to be considered is whether appellant was able to post a supersedeas bond at the time he satisfied the judgment.

*Lytle*, 4 Ark. App. at 296-97. *See also Sherman Waterproofing, Inc. v. Darragh Co.*, 81 Ark. App. 74, 98 S.W.3d 446 (2003); *Hendrix v. Winter*, 70 Ark. App. 229, 16 S.W.3d 272 (2000); *Smith v. Smith*, 51 Ark. App. 20, 907 S.W.2d 755 (1995); *DeHaven v. T & D Development, Inc.*, 50 Ark. App. 193, 901 S.W.2d 30 (1995).

However, none of the cases relied upon by HMNH involved a situation where the sheriff had obtained a writ of execution and levied on the appellant's property. In *Ward v. Williams*, 354 Ark. 168, 118 S.W.3d 513 (2003), the parties contested an oral contract for the sale of a parcel of land. The trial court found that specific performance of the contract was the appropriate remedy, and ordered the Wards to convey title to the property to Williams. The court entered a stay of the judgment pending the posting of a supersedeas bond. However, the Wards never posted a supersedeas bond, and the trial court entered an order vesting title to the disputed land in Williams. *Ward*, 354 Ark. at 175. The Wards appealed, and Williams advanced an argument that their appeal was moot, because the judgment had already been satisfied. This court rejected that argument, however, noting that it did "not believe that the absence of a supersedeas bond and the granting of the land to Williams as part and parcel to execution on a judgment nullifies an appeal from that underlying judgment." *Id.* at 182.

Admittedly, RHCS did not post a supersedeas bond in this case. However, while the posting of a bond is "one of the most important factors to be considered" in determining whether a judgment has been satisfied voluntarily, the court must still consider as an additional factor the fact that the judgment was only satisfied as the result of the sheriff's levying a writ of execution on RHCS's property. Given that the satisfaction of the judgment in this case was not a purely voluntary act on RHCS's part, but was instead the result of a writ of execution, we decline to dismiss RHCS's appeal.