WINDSONG ENTERPRISES, INC. *v.* Richard UPTON

05-616                                    233 S.W.3d 145

Supreme Court of Arkansas

Opinion delivered March 23, 2006

[Rehearing denied May 11, 2006.*]

*Belew & Bell*, by: *John Belew*; and *Cross, Gunter, Witherspoon & Galchus, P.C.*, by: *M. Stephen Bingham*, for appellant.

* DONALD E. PREVALLET, Sp.J., joins. DICKEY, J., not participating.

*Stuart W. Hankins* and *A. Vaughan Hankins*, for appellee.

ANNABELLE CLINTON IMBER, Justice. Appellant Windsong Enterprises, Inc., ("Windsong") is a land developer. On July 10, 1997, Windsong purchased a tract of real property in Eden Isle Subdivision at a foreclosure sale in Cleburne County. The property known as Southwinds had previously been owned by Red Apple Enterprises Limited Partnership ("Red Apple Enterprises"), the owner of approximately 48% of the real estate in Eden Isle. Appellee Richard Upton resides in Eden Isle and has a controlling interest in two corporations[1] that acquired Red Apple Enterprises in 1995.

Soon after the foreclosure sale, Windsong discovered that the property it had acquired at the sale included parts of the Red Apple golf course. Initially, Upton made several attempts to reacquire the golf course encroachments, but the parties were unable to agree on a purchase price. According to Windsong, it was at that point that Upton began to interfere with Windsong's plans to develop its land in Eden Isle in accordance with the bill of assurance in effect at the time Windsong purchased the land. Specifically, in 1997 the bill of assurance reflected that the Southwinds property was zoned for condominiums. In retaliation for the golf course dispute, Windsong claims that Upton gathered support from relatives and friends who also owned property in the Eden Isle subdivision to amend the bill of assurance so as to restrict the development of unplatted acreage, such as Southwinds, to single-family residences.

Eden Isle Corporation[2] and its president, Donald Tollefson, filed this action against Windsong in chancery court[3] seeking a declaratory judgment on the issue of whether Windsong should be allowed to subdivide its property without approval from Eden Isle Corporation. Windsong responded by filing a counterclaim that included allegations of intentional interference with a business

---

[1] United Resorts, Inc., an Arkansas Corporation, and Island Enterprises, L.L.C., an Arkansas Limited Liability Company.

[2] The subdivision's bill of assurance grants Eden Isle Corporation, a nonprofit corporation, certain authority with reference to the lots and property in Eden Isle Subdivision.

[3] By virtue of Amendment 80 to the Arkansas Constitution, which became effective on July 1, 2001, our state courts are no longer chancery and circuit courts. These courts have merged and now carry the designation of "circuit court." *Perkins v. Cedar Mountain Sewer Imp. Dist. No. 43 of Garland County,* 360 Ark. 50, 199 S.W.3d 667 (2004).

expectancy. The counterclaim was subsequently amended for the purpose of joining Red Apple Enterprises and Richard Upton as third-party counterdefendants.

Meanwhile, Eden Isle Corporation filed a second lawsuit in circuit court against Windsong and Red Apple Enterprises concerning the sewer service in the Eden Isle subdivision. Upton, however, was not named as a party defendant in the sewer case. In that lawsuit, Windsong again filed a counterclaim against Eden Isle Corporation and a cross-claim against Red Apple Enterprises. Both the counterclaim and cross-claim included allegations of tortious interference with a business expectancy. After filing several amendments to its counterclaim in the first lawsuit, Windsong eventually nonsuited all of its claims for intentional interference with a business expectancy in both cases on June 15, 2001.

Nevertheless, almost one year later, on May 21, 2002, Windsong filed a seventh amended counterclaim in the first lawsuit and reasserted its claims for intentional interference with a business expectancy against Eden Isle Corporation and Upton. Once again, Windsong nonsuited its claim against Eden Isle Corporation, leaving Upton as the sole counterdefendant. Upton responded to Windsong's eighth amended counterclaim by filing a motion to dismiss the seventh and eighth amended counterclaims. The circuit court[4] entered an order stating that it would consider the motion to dismiss as a motion for a more definite statement and gave Windsong sixteen days to file an amended counterclaim against Upton.

In compliance with the court's order, Windsong filed a "restated complaint" against Upton on January 10, 2003.[5] In that complaint, Windsong alleged that Upton had influenced Eden Isle Corporation to impose certain conditions on Windsong in connection with the development of its property. The restated complaint specifically stated

> Mr. Upton knew of Windsong's development plans which were consistent with the existing development in the area and with the existing provisions of the Bill of Assurance. Armed with this knowledge, Mr. Upton, whether through his personal information

---

[4] Because this order was entered after July 1, 2001, the court, formerly known as chancery court, is properly referred to as circuit court.

[5] Although the record lodged in this appeal does not include the restated complaint, that pleading is located in the record lodged in the original appeal, CA 03–1142.

or through the exercise of his necessary approval, repeatedly caused the Bill of Assurance and Dedication to be amended, revised, and ultimately, rewritten, all to Windsong's detriment. He manipulated [Eden Isle subdivision] to act adversely to Windsong and otherwise tortiously interfered with Windsong's contractual rights and business expectancies. Since Windsong's purchase, Mr. Upton supported a limitation on Windsong's rights to services, thwarted its ability to subdivide the property, undertook offensive activities on lands adjacent to Windsong's property and imposed new restrictions on the use for Windsong's property.

Shortly after Windsong filed the restated complaint, Upton filed a motion for summary judgment. In that motion he raised four separate, independent grounds in support of summary judgment: (1) *res judicata*, (2) lack of tortious interference based upon an expectancy subject to a contingency, (3) lack of an independent contract and no basis for piercing the corporate veil, and (4) no cognizable claim for tortious interference with land use. The circuit court granted Upton's motion for summary judgment[6] and, for purposes of appeal, included a certification pursuant to Ark. R. Civ. P. 54(b) (2005).

An appeal by Windsong followed, but Upton moved to dismiss the appeal, contending that the Rule 54(b) certification was insufficient. The Arkansas Court of Appeals granted Upton's motion and dismissed the appeal pending final resolution of all the remaining issues in the case. The circuit court then entered an order disposing of the remaining claims, and Windsong proceeded with a second appeal to the Arkansas Court of Appeals. In affirming the circuit court's award of summary judgment, the court of appeals concluded that, as a matter of law, Windsong did not have a valid business expectancy. *Windsong Enters., Inc. v. Upton*, CA 04-571 (Ark. App. Feb. 9, 2005). Windsong then filed a petition for rehearing. The court of appeals in a 6-3 decision granted rehearing and issued a substituted opinion in which it reversed the circuit court's grant of summary judgment, stating that Windsong "sufficiently demonstrated the existence of genuine issues of material fact on all of the elements of a claim for tortious interference with a business expectancy . . . ." *Windsong Enters., Inc. v. Upton*, 91 Ark. App. 149, 209 S.W.3d 373 (2005). Although the court of appeals initially declined to address any of the remaining issues asserted in support of summary judgment,

---

[6] The court's order does not reflect the basis for entry of summary judgment.

those issues were ultimately addressed in a supplemental opinion issued on petition for rehearing. *Windsong Enterprises, Inc. v. Upton*, CA 04-571 (Ark. App. June 29, 2005). This court subsequently granted Upton's petition for review. Thus, we have jurisdiction pursuant to Ark. Sup. Ct. R. 1-2(e) (2005). When we grant a petition for review following a decision by the court of appeals, we review the case as though it had been filed here originally. *Wallace v. West Fraser South, Inc.*, 365 Ark. 68, 225 S.W.3d 361 (2006).

In *Maddox v. City of Fort Smith*, 346 Ark. 209, 56 S.W.3d 375 (2001), we set out the standard of review for a grant of summary judgment:

> Summary judgment should be granted only when it is clear that there is no issue of fact to be litigated, and the moving party is entitled to judgment as a matter of law. *Rankin v. City of Fort Smith*, 337 Ark. 599, 990 S.W.2d 535 (1999). Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, responses to requests for admission, and affidavits show that there is no genuine question of material fact to be litigated and the moving party is entitled to judgment as a matter of law. *Loewer v. Cla-Cliff Nursing and Rehab. Ctr.*, 344 Ark. 258, 39 S.W.3d 771 (2001). The burden of proving that there is no genuine issue of material fact is upon the moving party. *Id.* On appellate review, we must determine if summary judgment was proper based on whether the evidence presented by the moving party left a material question of fact unanswered. *Id.* This court views the proof in a light most favorable to the party resisting the motion, resolving any doubts and inferences against the moving party, to determine whether the evidence presented left a material question of fact unanswered. *Rankin v. City of Fort Smith, supra.*

*Id.* at 213-14, 56 S.W.3d at 378. On appeal, Windsong argues that none of the four grounds enumerated in Upton's motion justify the entry of summary judgment, and, thus, the circuit court erred in granting the motion for summary judgment. Because we are persuaded that the circuit court properly granted summary judgment on Windsong's interference-with-business-expectancy claim, we affirm the circuit court's entry of summary judgment.[7]

We have recognized the tort of interference with a business expectancy. *Donathan v. McDill*, 304 Ark. 242, 800 S.W.2d 433 (1990).

---

[7] In view of our affirmance on this point, we need not address any of the other grounds raised in Upton's motion for summary judgment.

It consists of five elements: (1) a valid business expectancy, (2) of which the defendants knew and (3) with which they intentionally interfered (4) causing a loss of the expectancy and (5) resulting damages. *Id.* However, as explained in *Donathan v. McDill, supra,* an expectancy subject to a contingency, which occurred, is not tortious interference with business expectancy. *Id.* For example, in that case, the appellant hired a title company to research the title to a parcel of land that he wished to buy. *Id.* The appellant was informed by the title company that the land was soon to be sold for nonpayment of taxes. At the tax sale, the appellant and the title company's president, McDill, bid on the land, but the appellant's bid was accepted. Thereafter, McDill informed the former landowner of his statutory right to redeem the land. The former landowner then redeemed the land and McDill entered into negotiations with the landowner to purchase the property. The circuit court granted summary judgment on the ground that McDill's actions in bringing about the contingency did not constitute tortious interference. We affirmed, holding that the appellant "had no expectancy other than the one subject to the contingency which occurred." *Id.* at 244, 800 S.W.2d at 434. Our holding in the *McDill* case is apposite and controlling in the instant matter on appeal.

Windsong's business expectancy that it could develop condominiums in the Eden Isle subdivision was subject to the provisions of the Bill of Assurance. In fact, Windsong admitted in its restated complaint that it "purchased the Southwinds property on July 10, 1997, *relying on the provisions of the Bill of Assurance and the Dedication* which allowed it to be developed as multifamily residential." (Emphasis added.) More specifically, Section 21 of the Bill of Assurance provides as follows:[8]

> 21. AMENDMENTS: *Any and all of the covenants, provisions or restrictions set forth in this bill of assurance may be amended, modified, extended, changed or cancelled, in whole or in part,* by a written instrument signed and acknowledged by the owner or owners of over fifty percent (50%) in area of the land in the subdivision, and the provision of such instrument so executed shall be binding, from and after the date it is duly filed for record in Cleburne County, Arkansas. These covenants, restrictions and provisions of this instrument shall be deemed covenants running with the land, and

---

[8] Since the original Bill of Assurance was adopted and recorded in 1963, Section 21's language has not been modified.

shall remain in full force and effect unless amended or cancelled as authorized herein before.

(Emphasis added.) With regard to the interpretation of language in a restrictive covenant, we have recently held that where the language is clear and unambiguous, the parties will be confined to the meaning of the language employed, so long as the meaning does not defeat the plain and obvious purpose of the provision. *The Clifford Family, LLC v. Cox*, 334 Ark. 64, 971 S.W.2d 769 (1998); *Barber v. Watson*, 330 Ark. 250, 953 S.W.2d 579 (1997).

As indicated by the plain language in the above-quoted section, Windsong knew or should have known when it purchased the Southwinds property that the restrictions in the Bill of Assurance could be changed. Windsong nonetheless argues in its supplemental brief that the New Plat and Bill of Assurance was not an amendment, modification, extension, change or cancellation in accordance with Section 21; rather, the New Plat and Bill "imposed a new restriction on Windsong's property that had not previously existed." This argument, however, ignores the clear and unambiguous language of Section 21 that states "any and all . . . restrictions . . . may be . . . changed . . . by a written instrument signed and acknowledged by the owner or owners of over fifty percent (50%) in area of the land in the subdivision . . . ." As noted by the Colorado Supreme Court in *Evergreen Highlands Ass'n v. West*, 73 P.3d 1 (Colo. 2003), the language "may change or modify" in a protective covenant "is expansive enough in its scope to allow for the adoption of a new covenant." *Id.* at 7. Thus, we are persuaded that the language in Section 21 is broad enough to have notified Windsong that, upon ratification by the owners of over 50% of the land in the Eden Isle subdivision, the restrictions in the bill of assurance could be changed so as to increase or reduce restrictions on the development of unplatted acreage.[9]

---

[9] Windsong also cites *Boyles v. Hausmann*, 246 Neb. 181, 517 N.W.2d 610 (1994), *Van Deusen v. Ruth*, 343 Mo. 1096, 125 S.W.2d 1 (1938), *Webb v. Mullikin*, 142 S.W.3d 822 (Mo. Ct. App. 2004), *Jones v. Ladriere*, 108 S.W.3d 736 (Mo. Ct. App. 2003), and *Meresse v. Stelma*, 100 Wash. App. 857, 999 P.2d 1267 (2000), in support of its argument that, under the original bill of assurance, Upton was not allowed to impose a "new restriction" on Eden Isle. These cases, however, are distinguishable. The respective amendment provisions addressed in *Boyles v. Hausmann, supra, Van Deusen v. Ruth, supra,* and *Meresse v. Stelma, supra,* do not include language that any and all restrictions "may be changed." Moreover, we are not persuaded by the holdings in *Webb v. Mullikin, supra,* and *Jones v. Ladriere, supra.* In each of those cases, the Missouri Court of Appeals relied upon *Van Deusen v. Ruth, supra,* which, as stated earlier, is inapposite.

Moreover, Eden Isle filed a motion for partial summary judgment, asking the circuit court to rule as a matter of law that the New Plat and Bill of Assurance were properly adopted pursuant to Section 21, the amendment provision contained in the original bill of assurance. Windsong did not reply or contest the motion, and the circuit court granted partial summary judgment. In its order, the court ruled in relevant part:

> The new Plat, Bill and New Dedication, having been signed and acknowledged by owners of more than 50% in the area of the land in the Eden Isle Subdivision, and recorded in the deed records for Cleburne County, Arkansas, constitute a legal and valid amendment and restatement of the dedication of Eden Isle Subdivision and the Plat and Bill of Assurance of Eden Isle Subdivision, validly adopted in accordance with the amendatory provisions contained in the original Dedication, Plat and Bill of Assurance of Eden Isle Subdivision . . . .

In a separate order, the court also dismissed Windsong's sixth and seventh amended counterclaims, to the extent they sought to "invalidate the Amended and Restated Plat and Bill of Assurance" due to Windsong's failure to join all necessary parties, particularly the landowners in Eden Isle. Notably, Windsong chose not to challenge these two orders either below or on appeal, thereby electing not to argue that the New Plat and Bill of Assurance were invalid under the provisions of the original bill of assurance.

■ Thus, because the language in Section 21 clearly states that the restrictions in the bill of assurance are subject to change, and because there is no challenge to the validity of the New Plat and Bill of Assurance, we must conclude that Windsong's business expectancy was always subject to the contingency stated in Section 21 of the original bill of assurance. In other words, Windsong "had no expectancy other than the one subject to the contingency which occurred." *Donathan v. McDill*, 304 Ark. at 244, 800 S.W.2d at 434.[10] While Upton's actions may have brought about the contingency, his actions did not, as a matter of law, constitute tortious interference.

---

[10] In *Donathan v. McDill, supra,* we affirmed the circuit court's grant of summary judgment even though McDill's actions clearly were in conflict with the interest of his client.

Affirmed.

Dickey, J., not participating.

Special Justice Don Prevallet joins.