DECK HOUSE, INC. *v.*
Scott LINK, Albena Link, Charles Cooper,
and Advanced Construction & Painting Co.

CA 06-264                                                    249 S.W.3d 817

Court of Appeals of Arkansas
Opinion delivered February 14, 2007

[Rehearing denied April 4, 2007.]

*Friday, Eldredge & Clark, LLP*, by: *Jeffrey H. Moore*, for appellant.

*Taylor Law Firm*, by: *Scott E. Smith* and *Sonya J. Dodson*, for appellees Scott and C. Albena Link.

WENDELL L. GRIFFEN, Judge. Deck House, Inc., appeals from the grant of directed verdicts in favor of appellees Scott and Albena Link, Charles Cooper, and Advanced Construction & Painting Company. On appeal, appellant argues that the trial court erred in (1) directing a verdict in favor of the Links in its breach of contract claim and in improperly applying the "tacit-agreement test"; and (2) directing a verdict in favor of Cooper and Advanced Construction upon a finding that there was no evidence of intentional or improper conduct to support a verdict for tortious interference with a business expectancy. We affirm.

Appellees Scott and Albena Link planned to build a house on a lot that they own and entered into a "Pre-Contract Service Agreement" with appellant Deck House, which supplies plans and

materials for post-and-beam structures, to purchase architectural drawings for $3000 from appellant. The contract provided:

> The Purchaser desires to construct a Deck House incorporating building components to be manufactured and/or supplied by Deck House, Incorporated. Signing this agreement does not commit you to purchase a house package, but does authorize Deck House, Incorporated, to prepare for you the services [the architectural drawings] outlined below.

It also stated that, if the Links elected to proceed with construction of a Deck House, the $3000 fee would be applied against the amount due under a "Deck House Component Package Contract"; if not, appellant would retain the fee. The contract also stated:

> 4. All drawings, including those prepared by the Deck House Representative, and other materials supplied to the Purchaser will remain the sole and exclusive property of Deck House, Incorporated and under no circumstances shall the Purchaser be deemed to have acquired any rights to the same. The Purchaser agrees that such drawings and materials may not be used, in whole or in part, for any other purpose than in the construction of one Deck House utilizing a Deck House Component Package. Any other use of such drawings and materials may be treated by Deck House, Incorporated, as an unauthorized appropriation of same by Purchaser. Uses constituting an unauthorized appropriation will include, without limitation: a) the copying of any part of the drawings b) the utilization or partial utilization of the drawings for the construction of an architecturally related residence, or, c) any transfer of the drawings to another person without written authorization from Deck House, Incorporated.

Deck House contacted appellee Charles Cooper, who owns appellee Advanced Construction & Painting Company, and requested that he submit a bid to the Links for construction of a Deck House, using appellant's plans and materials. After meeting in October 1999 with Cooper and Ed Fanning, appellant's project manager, about the cost of constructing a Deck House (at least $270,000), Scott Link sent a letter on December 1, 1999, to David Schmidt, a draftsman, in which he stated:

> In October, after I met with Mike Cooper, I spoke with you via telephone regarding using house plans I had made using Deck House as a base to develop plans for a non-post and beam house.

You estimated that the cost of developing plans should be around 60 to 70 cents per square foot. I then spoke with Mike and he was going to give you a set of plans he had used to estimate construction costs and I was to call you and we would the [sic] proceed with the house plans.

Enclosed is a set of the last house plans from Deck House. We think these are a good base for development of a house that my wife and I want to build on our property at Beaver Lake. The cost of building this home using the Deck House post and beam construction is too expensive. We want to build our home for a cost around $200,000 and would like for Mike Cooper to do the construction.

Our thoughts on changes to the plan include:

1. Make Breakfast room larger, say 9' to 10' inside dimensions.

2. Kitchen sink centered on counter with dishwasher to the right side.

3. Add a small sink in counter to the right of the stove.

4. 8' ceilings through out house except for living room which we would like to be cathedral between 10' & 11'.

5. Move fireplace to a corner unit, extend wall across room to approximate previous location of fireplace.

6. If cost effective reduce length of living room from 28' to 26'.

   • taking a foot from study & from entry? or

   • reworking layout of entry, lav. & study?

7. House must be wheelchair accessible. 36" doors except the half bath.

8. Mike Cooper has suggestions for siding, window and other changes.

We hope this will give us a good starting point for discussing the development and productions of the house plans. . . .

I have meet [sic] with Mike, seen and like his work and respect his thoughts on building a home. I would like to involve Mike in

the development of the plans where ever it is helpful if he is agreeable.

Albena and I look forward to working with you and developing plans for a home that we can afford to build.

Appellant later became aware of the fact that, using plans drafted by Schmidt, Cooper built a less expensive "stick-built" house for the Links that was, without dispute, similar to appellant's plans. In its May 27, 2004, amended complaint against appellees, appellant alleged that the Links had breached their contract by failing to return the architectural drawings when they decided not to proceed with the building of a Deck House; by transferring those drawings to Schmidt for alteration; and by using the drawings in the construction of a structure that did not utilize the Deck House Component Package. In its second count, appellant asserted that Cooper and Advanced Construction "acted with knowledge of the valid contractual relationship and business expectancy between Deck House and the Links."

The case proceeded to trial by jury on October 31 and November 1, 2005. At the close of appellant's case, all appellees moved for directed verdict and the trial court granted their motions. It explained its decision as to the claim against the Links as follows:

> [T]he Court finds that a contract has been proven that required the plaintiff to prepare plans and drawings for the consideration of $3,000. That they did do that. That Mr. and Mrs. Link received those plans and drawings, and that they made a utilization or partial utilization of the drawings for the construction of an architecturally related residence from which a jury could conclude that to be a breach of contract, and that, in this case, the plaintiff has shown consequential damages from which they had an expectancy or reliance to make a profit. That lost profits are recognized as a type of consequential damages.
>
> The really hard part, for me, is to determine what is fairly within the contemplation of the parties. The contract, as drawn by Deck House, does not have any language in it to reflect the contemplation of the parties. In fact, the second sentence of the agreement says, signing this agreement does not commit you to purchase a house package.
>
> I find that the damages that were fairly within the contemplation of the parties, as presented by the evidence in this case, is the

reasonable value of the architectural services provided by Deck House in — I understand that they're not in the business of providing architectural plans and drawings only, but their contract contemplates the selling of a house package, but when they also say in their agreement that signing this agreement does not commit you to purchase a house package, then I cannot find that it is within the contemplation of the parties as to what the damages would be in the event of an unauthorized appropriation, other than the actual value of drawing the architectural design of the house and the value of providing the ideas for the layout of the house, the floor plan, and that the lost profit for providing a house package was not within the contemplation of the parties in the event of a wrongful use of the drawings.

All that being said, then it is my view that, under the law, the plaintiff has failed to prove damages, and that a directed verdict should be issued in favor of Mr. and Mrs. Link. . . .

The trial court made the following findings from the bench regarding the motion for directed verdict by Cooper and Advanced Construction:

Apparently, after that contract had been fully performed by Deck House, the evidence then goes on to show that Deck House contacted Mr. Cooper and his corporation to submit a bid to the Links to construct — for using a house package provided by Deck House to construct the Deck House product. Mr. Cooper and his company apparently provided a bid, and the evidence is that the Deck House package price of $138,502 combined with the bid by Mr. Cooper and his company to show a completed construction price of $270,000.

There is no evidence that Mr. Cooper's bid was inflated in any way, was not made in good faith, was more expensive than it should have been, or was, in any way, calculated to cause the Links not to accept the construction price contemplated by the Deck House Pre-contract Service Agreement or calculated to convince the Links to enter into the second phase of the process, wherein they would commit to spend money to acquire the architectural drawings, based on the evidence of the Deck House procedures in these kinds of cases. That, in fact, the Links, based on the bid estimate by Mr. Cooper and his company, determined that they were electing not to proceed with construction of a Deck House component package or enter into a component package contract.

The Court cannot find that there is any evidence that Mr. Cooper, in any way, prior to the decision made by Mr. and Mrs. Link to not enter into a component package contract, that at that point, he and — that, after the Links had communicated that they did not intend to continue negotiating with Deck House, that, at that point, he and his company were free to enter into other negotiations with Deck House. There is no evidence that Mr. Cooper was under any knowledge that Mr. and Mrs. Link should not use the drawings for any purpose, and that their use of drawings would be in breach of their agreement.

All that the Court has is speculation and conjecture that he made more money as a result of the construction of the house as a stick built house, as opposed to the amount of money that he would have made had he constructed the Deck House. And, in fact, it was Mr. Cooper's testimony that he believes that he would have made more money on the construction of the Deck House.

The evidence is very fuzzy as to what he was actually bidding on when the combined bid of $270,000 was submitted to the Links. There's only oral testimony and only a — we derived the Cooper bid by taking the combined price testimony of $270,000 and subtracting from it the Deck House price of $138,502 to arrive at whatever the parties believe Cooper bid. But, as to what he was going to actually do for that bid, the Court is in the dark.

There is no evidence that Mr. Cooper, in any way, encouraged, counseled, or suggested to Mr. and Mrs. Link that they could acquire essentially the same house that Deck House designed for less money if he were contracted to bid it as a stick construction project. And, in fact, at the time that Mr. Schmidt was asked by Mr. Link, apparently by his letter on December the 1st, 1999, Mr. and Mrs. Link apparently decided that they would like for Mike Cooper to do the construction.

. . . .

. . . . In this case, it appears that the evidence is that the Defendant Cooper and his company had knowledge of the pre-contract entered into by the Links and Deck House in this case, and submitted a bid for that work, which ultimately the total price of the entire cost of construction of the house was $270,000, which the Links were unwilling to obligate themselves to pay.

Then the evidence appears to be undisputed that Mr. Cooper and his company negotiated and entered into a contract to build a stick home on what may — that has some similarities to the design that Mr. Cooper had knowledge of was similar to — or had a relationship to the home negotiated by Deck House.

. . . .

. . . . I cannot find evidence in the record of this case which would be sufficient to create a jury issue that Mr. Cooper or his company's acts were intentional and improper.

Specifically, there is a lack of evidence, in any way, that there was any business ethical code or established business custom which would prohibit a contractor, under the circumstances of this case, from accepting work offered by an owner of property like Mr. and Mrs. Link. That there is no evidence of business ethical codes or established business customs that make it improper for Mr. Cooper or his company to accept a contract to construct a home under the plans drawn by Mr. Schmidt. Therefore, the Court also sustains the motion for directed verdict, in this case, as to Mr. Cooper and his company.

In the December 1, 2005 judgment dismissing appellant's complaint, the trial court stated:

2. . . . [T]he Court finds that [appellant] offered damage testimony concerning the lost profits [appellant] would have realized had the . . . Links purchased building materials from [appellant] for the construction of their residence. The Court finds that there was no specific language within the contract as drafted by [appellant] and signed by the . . . Links regarding the contemplation of the parties as to the proper measure of damages should [the] Links breach their contract as alleged by [appellant]. After review of said contract, the Court finds that the damages which are found to have been fairly within the contemplation of the parties include the value of the architectural services and assistance and ideas provided by employees or agents of [appellant] for said drawings and floor plan. The Court specifically finds that lost profits related to the construction component package was [sic] not in contemplation of the parties regarding the unauthorized use of said drawings as alleged against [the] Links.

The trial court added that appellant had failed to prove an appropriate measure of damages. As for Cooper and Advanced Construction, the

trial court stated that there was insufficient evidence to create a jury issue that Cooper's conduct was intentional or improper.

In determining whether a directed verdict should have been granted, we view the evidence in the light most favorable to the party against whom the verdict was sought and give it its highest probative value, taking into account all reasonable inferences deducible from it. *Morrow Cash Heating & Air, Inc. v. Jackson*, 96 Ark. App. 105, 239 S.W.3d 8 (2006). A motion for directed verdict should be granted only if there is no substantial evidence to support a jury verdict. *Id.* Where the evidence is such that fair-minded persons might reach different conclusions, then a jury question is presented, and the directed verdict should be reversed. *Id.*

Appellant argues in its first point that the trial court erred in granting the Links' motion for directed verdict on the ground that the damages sought by appellant — lost profits — were consequential damages for which the Links had not contemplated being held liable in the event of their breach. In general, damages recoverable for breach of contract are those damages that would place the injured party in the same position as if the contract had not been breached. *Dawson v. Temps Plus, Inc.*, 337 Ark. 247, 987 S.W.2d 722 (1999). Lost profits have been held to be consequential damages when they do not flow directly and immediately from breach of a contract but flow from some consequence or result of the breach. *Id.* In order to recover consequential damages in a breach-of-contract case, a plaintiff must prove more than the defendant's mere knowledge that a breach of contract will entail special damages to the plaintiff; it must also appear that the defendant at least tacitly agreed to assume responsibility. *Reynolds Health Care Servs., Inc. v. HMNH, Inc.*, 364 Ark. 168, 217 S.W.3d 797 (2005). Parties may expressly agree to be responsible for consequential damages; however, in the absence of such an express contract to pay such special damages, the facts and circumstances in proof must be such as to make it reasonable for the judge or jury trying the case to believe that the party at the time of the contract tacitly consented to be bound to more than ordinary damages in case of default on his part. *Id.*

However, the "tacit-agreement" rule does not apply where the lost profits are the natural and direct result of the breach. *Robertson v. Ceola*, 255 Ark. 703, 501 S.W.2d 764 (1973). Appellant argues that the damages it sought for the Links' breach of the contract were, in this case, not consequential damages, but simply

the benefit of their bargain and the direct and natural result of the Links' using appellant's drawings without purchasing the Component Package. They assert that the proper measure of damages in this case was the remainder ($38,000) of the difference between the price of the Component Package materials ($138,502) and the costs saved from not having to supply those materials ($97,000).

■ Lost profits are not always consequential damages; sometimes, they may be the natural, proximate result of a breach of contract. *Robertson v. Ceola, supra; see also Advance Constr. Co. v. Dunn,* 263 Ark. 232, 563 S.W.2d 888 (1978). However, in this case, the $38,000 in lost profits was not the direct and natural result of the Links' unauthorized use of appellant's drawings. The "Pre-Contract Service Agreement" expressly provided that the Links were not committed to purchase a house package. It stated that the use of appellant's drawings, in whole or in part, for any other purpose than the construction of a Deck House would be treated as "an unauthorized appropriation." It did not indicate what the damages would be for such an unauthorized appropriation, nor did it state that the Links would be liable to pay appellant the full Component Package price of $138,502 if they breached the contract and used appellant's drawings without authorization. Thus, the trial court was correct in classifying the lost profits as consequential damages in this situation.

The next question, therefore, is whether the Links tacitly agreed to be liable for consequential damages. Appellant urges this court to hold that, even if its lost profits were consequential damages, there was substantial evidence for the jury to conclude that the Links contemplated that, if they used appellant's drawings, they would be liable to pay appellant the full Component Package price. The two-pronged "tacit-agreement test" used by the courts requires the plaintiff to prove more than the defendant's mere knowledge that a breach of contract will entail special damages to the plaintiff; it must also appear that the defendant at least tacitly agreed to assume responsibility. *Reynolds Health Care Servs., Inc. v. HMNH, Inc., supra.* Mere notice is not always sufficient to impose on the party who breaks a contract damages arising by reason of special circumstances:

> [W]here the damages arise from special circumstances, and are so large as to be out of proportion to the consideration agreed to be paid for the services to be rendered under the contract, it raises a doubt at once as to whether the party would have assented to such

a liability had it been called to his attention at the making of the contract unless the consideration to be paid was also raised so as to correspond in some respect to the liability assumed. To make him liable for the special damages in such a case, there must not only be knowledge of the special circumstances, but such knowledge "must be brought home to the party sought to be charged under such circumstances that he must know that the person he contracts with reasonably believes that he accepts the contract with the special condition attached to it." *In other words where there is no express contract to pay such special damages, the facts and circumstances in proof must be such as to make it reasonable for the judge or jury trying the case to believe that the party at the time of the contract tacitly consented to be bound to more than ordinary damages in case of default on his part. . . .*

*Bank of America, N.A. v. C.D. Smith Motor Co.*, 353 Ark. 228, 240-41, 106 S.W.3d 425, 431 (quoting *Hooks Smelting Co. v. Planters' Compress Co.*, 72 Ark. 275, 286-87, 79 S.W.1052, 1057 (1904) (emphasis in original)).

The question of whether notice of any such special circumstances was given to the breaching party is a question of fact. *Reynolds Health Care Servs., Inc. v. HMNH, Inc., supra.* In determining the reasonable contemplation of the parties, it is proper to consider the nature and purpose of the contract and the attending circumstances known to the parties at the time the contract was executed. *Id.*

In *Bank of America v. C.D. Smith Motor Co., supra,* the supreme court found sufficient evidence to support a conclusion that the defendant had been put on notice that it would be liable for lost profits. The parties in that case had established a recourse-financing relationship and in 1996 signed a written agreement. The bank eventually ended its recourse-financing program and terminated the parties' agreement. Smith went out of business within a year and sued the bank for breach of contract. When he signed the contract, Smith testified, he told the bank's vice president for commercial lending that, if he didn't honor the contract, he would hold the bank responsible. The bank's president acknowledged at trial that Smith may have told the vice president that he would look to the bank for compensation if his business was destroyed. The supreme court found that this was sufficient evidence that the bank had tacitly agreed to be liable for any special damages arising from the breach of contract.

█ Although the Links knew that appellant was in the business of selling materials along with its drawings, there is no evidence that they tacitly agreed to pay the full Component Package price if they used appellant's drawings without authorization. We hold that the trial court accurately analyzed this question, and we affirm the directed verdict for the Links.

Appellant also argues that the trial court erred in directing a verdict for Cooper and Advanced Construction. To establish a claim of tortious interference, a plaintiff must prove: (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Vowell v. Fairfield Bay Cmty. Club, Inc.*, 346 Ark. 270, 58 S.W.3d 324 (2001). It is also necessary that the defendant's conduct be improper. *Id.* For guidance as to what is improper, the court should consider: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties. *Id.*

Appellant argues that it proved that Ed Fanning contacted Cooper, explained appellant's business, and informed him that appellant was working with the Links and looking for a local builder to supply the labor and manage the construction of a Deck House and that it explained to Cooper that it not only provides drawings but also sells building materials. Appellant points to testimony that it supplied the drawings to Cooper and that Cooper, the Links, and Fanning met in October 1999, at which appellant's price of $138,502 and Cooper's price, totaling $270,000, were presented. Also, Cooper admitted providing the name of a draftsman, Dave Schmidt, to the Links, after they had already decided against building a Deck House. Appellant contends that the trial judge erred in resolving disputed facts by finding that Cooper was not contacted until after the pre-contract service agreement was fully performed; according to appellant, Cooper was contacted in advance of the October 1999 meeting where the drawings and the Component Package price were presented to the Links. Appellant also points to the evidence showing that Cooper

would have earned more by building a house that did not include appellant's materials. Cooper, however, testified that he thought that he would have made more money on the construction of the Deck House. Appellant argues that the jury should have been allowed to resolve the credibility issues and the inferences to be drawn from Scott Link's letter.

We acknowledge that there was evidence that Cooper had acted in a way that might have facilitated the Links' decision not to buy a Deck House package and instead to select the "stick built" house that Cooper ultimately constructed. There was testimony that Cooper recommended a draftsman, Dave Schmidt, to modify the Deck House plans and that Cooper told the Links that he could build a "stick built" house with a very similar floor plan for approximately $70,000 less than the Deck House design. Further, Scott Link memorialized this evidence in a letter that he wrote to Schmidt, which was admitted into evidence. It is certainly conceivable that a jury could conclude that Cooper's actions at least contributed to the Links' decision to not build a Deck House.

Nonetheless, we believe that this case must be affirmed because of the status of the tort of tortious interference with a business expectancy under Arkansas law. In *Windsong Enterprises, Inc. v. Upton*, 366 Ark. 23, 233 S.W.3d 145 (2006), our supreme court held that interference with a business expectancy is not actionable when the expectancy is subject to a contingency. Here, the writing that Deck House referred to as a "Pre-Contract Service Agreement" expressly contemplates the possibility that the Links would elect to not purchase a Deck House package and does not bind the Links to do so. The contingent nature of the Links' dealings with Deck House therefore makes the tort claim untenable as a matter of law. We must therefore affirm on this point because the trial court reached the right result, even though it may have announced the wrong reason. *See Middleton v. Lockhart*, 355 Ark. 434, 139 S.W.3d 500 (2003).

We deny the Links' motion for attorney's fees and costs incurred in preparing their supplemental abstract and addendum.

Affirmed.

HART and BIRD, JJ., agree.