2012 Ark. App. 214
**ACKER CONSTRUCTION, LLC, Appellant**

v.

**Hanh Billy TRAN, Appellee.**

**No. CA 11–610.**

Court of Appeals of Arkansas.

March 14, 2012.

Joe Dan Byars Jr., Fort Smith, for appellant.

Michael Joe Hamby, Fort Smith, for appellee.

CLIFF HOOFMAN, Judge.

Acker Construction, LLC, appeals from a judgment entered by the Scott County Circuit Court in favor of appellee, Hanh Billy Tran, in the amount of $68,307 for the cost of repairing seven chicken houses that appellant built for appellee and for appellee's lost profits resulting from appellant's delay in performance. On appeal, appellant raises four points: (1) the trial court erred in permitting appellee to introduce the testimony of an expert witness that appellant had hired to inspect the allegedly defective chicken houses before trial; (2) appellee's proof of lost-profit damages was legally insufficient; (3) the trial court abused its discretion in denying appellant's motion for a new trial because the jury's verdict for the cost-of-repair damages was not supported by the evidence; and (4) the trial court erred in refusing to permit appellant to introduce evidence of settlement negotiations. We affirm on all points.

In September 2005, appellant entered into a transaction set forth in two written contracts to build seven chicken houses for Sharon Wadkins and her husband in Waldron, Arkansas. One contract provided for the construction of four chicken houses for $390,340. The contract set forth the amounts that appellant could draw upon the completion of various stages of construction, with a final payment of $39,032 due upon completion. The other contract was for the completion of three chicken houses for $292,755 and also provided for draws and a final payment of $29,275 upon completion. Both contracts stated that appellant would not be liable for any consequential damages as a result of any defect in products or workmanship.

In November 2005, Sharon and Rory Wadkins assigned their interest in the contracts to appellee, who purchased the real estate upon which the chicken houses were

to be built. Appellee refused to make the final payments because of his belief that appellant had given a defective performance. On August 28, 2006, appellant filed a notice of intent to file a lien on the property. On April 27, 2007, appellant filed suit against appellee to recover the $68,307 due on the contracts. Appellee filed a counterclaim for breach of contract, asserting that appellant had failed to timely complete the project. He alleged that, instead of building the four chicken houses to their completion, so that birds could be received (from Tyson) and income generated while the additional three chicken houses were built, appellant worked on all seven houses at one time and did not complete them for almost ten months, depriving appellee of the income he had expected while the additional three houses were being built. He also alleged that appellant had installed inadequate insulation, thereby reducing the life expectancy of the buildings; that the footings and posts were not built according to the engineer's drawings; and that the cool-cell areas were not constructed with ⌊3treated wood, as required by the engineer's drawing. He also asserted that work needed to be done to correct a leaking roof, damaged and rotting ceilings, defective door locks, and a damaged door. Appellee asked for damages for the cost of repairs and for the loss of income.

Appellant engaged an expert as a consultant. In the fall of 2008, its representatives and attorney met with the expert, Clinton Holland of H & H Construction, with appellee at the farm so that Holland could review what appellee perceived to be the defects in the broiler houses. His estimate of the cost to make the repairs requested by appellee was $34,716.15. Later, appellant informed appellee that it had decided not to call Holland as a witness at trial. After appellee issued a subpoena for Holland to appear at trial, Holland called appellee's attorney and informed him that

he did not want to attend and suggested that, instead, he send a copy of his estimate of repairs by facsimile. Holland sent this information but did not otherwise discuss his testimony with appellee's attorney.

Appellant filed a motion in limine to exclude testimony about appellee's lost profits on the ground that they were speculative and were consequential damages, for which it had not agreed to be liable. Appellee responded that the lost profits he sought were not consequential damages, but were the natural, proximate result of appellant's breach of contract. He stated that Sharon Wadkins would testify that she had informed Henry Quinn, appellant's salesman, that she would only enter into a contract with appellant if it would agree to build four chicken houses first so that she could have birds in place and be drawing income while the other three chicken houses were being completed. He also stated that he and Wadkins would testify about the calculation of lost-profit damages with sufficient ⌊4specificity to take the claim out of the realm of speculation. Appellant filed a second motion in limine to exclude the testimony of Clinton Holland on the ground that his opinion was privileged under Arkansas Rule of Civil Procedure 26(b)(4)(B). In response, appellee asserted that Rule 26 did not apply to this situation because Holland's identity as an individual with knowledge of the facts was already known to appellee.

On the first day of trial, the parties argued about the motions in limine, as well as the evidence (consisting of two letters from appellee to appellant) that appellant sought to introduce about settlement negotiations. The trial court denied the motions in limine and refused to admit the evidence of settlement negotiations. Henry Quinn; Randy Acker, appellant's owner; Buddy Bean, whose company sold the

lumber used on the chicken houses; Calvin Bain, who served as the second supervisor on the project; Baron Bates, whose company installed the additional insulation to address appellee's concerns; Johnny Kean, whose employer installed the poultry equipment in the chicken houses; Stanley Forrest (through deposition), whose boss was Johnny Kean; and Dustin Womack, whose business originally installed the insulation, testified on behalf of appellant. Appellee testified and presented the testimony of Larry Schmalz, an engineer; Sharon Wadkins; Clinton Holland; and Trey Gage, a loan officer for Arvest Bank, which had provided funding for the project. Appellant called Trey Gage in rebuttal. At the conclusion of trial, appellant moved for directed verdict on lost-profit damages, which the trial court denied.

The jury returned a verdict for appellant of $0. On another form, the jury returned the following verdict:

We, the jury find by a preponderance of the evidence in favor of Hanh Billy Tran and award him damages against Acker Construction, LLC in the amount below for the following element of damage.

COST OF REPAIR: $ *$34716.00*

LOST PROFITS: *$33591.00* /$136,614 Awarded to Tran

Lien released?

M. Tran in turn pays Acker the $68,307 he owes. Lien to be released. NINE OF TWELVE JURORS WHO AGREE TO THE ABOVE:

Mr. Tran to pay the 68307 upon release of the lien.

On October 29, 2010, the circuit court entered the following judgment:

## II.

The jury herein entered an award of damages in favor of Billy Tran against Acker Construction in the amount of $136,614.00 and further directed that out of this $136,614.00, Mr. Tran was to pay Acker Construction $68,307.00 as an offset for the release of the lien filed by Acker Construction against Mr. Tran's property. The jury further specifically found that of the remaining $68,307.00 of said judgment, $34,716.00 was attributable to the cost of repairs and $33,591.00 was attributable to lost profits. Attached hereto as Exhibit "A" is a copy of the verdict form rendered in favor of Hanh Billy Tran in this matter. Attached as Exhibit "B" is a verdict form awarding $0.00 in damages to Acker Construction, LLC.

## III.

The net result of this verdict is a judgment in favor of Hanh Billy Tran against Acker Construction in the amount of $68,307.00 consisting of $34,716.00 for the costs of repairs and $33,591.00 in lost profits. This judgment shall bear interest at the rate of 6% per annum until paid. Interest shall accrue from the date of the entry of this Judgment herein and continue until said judgment is paid.

## IV.

The lien filed herein by Acker Construction against Hanh Billy Tran is hereby declared void and set aside, the same being attached hereto and incorporated herein as Exhibit "C".

Appellant then filed a motion for judgment notwithstanding the verdict (JNOV) and for new trial, which the trial court denied. Appellant filed a timely notice of appeal from the judgment and from the order denying the posttrial motion.

In its first point, appellant argues that the trial court erred in permitting appellee to call Holland as a witness. It asserts that in doing so, appellee made an "end run" around the privilege existing

between a lawyer and a consulting expert found in Arkansas Rule of Civil Procedure 26(b)(4)(B) (2011). The relevant portion of this rule states that a party may discover facts known or opinions held by an expert who has been retained by another party in anticipation of litigation or preparation for trial, and who is not expected to be called as a witness at trial, only upon a showing of exceptional circumstances under which it is impractical for that party to obtain the facts or opinions on the same subject by other means. The decision on whether to allow a witness to give expert testimony rests largely within the sound discretion of the trial judge, and we will not reverse that determination absent an abuse of discretion. *Richardson v. Union Pac. R.R. Co.*, 2011 Ark. App. 562, 386 S.W.3d 77.

■ The trial court ruled correctly on this issue because Rule 26, which is a rule of discovery, does not apply to this situation; appellant voluntarily disclosed Holland to appellee and brought him to inspect appellee's chicken houses in appellee's presence. Further, appellant's voluntary disclosure that Holland was an expert in this subject and that he had an opinion about the repairs, based upon his personal inspection, amounted to a waiver of any possible privilege under this discovery rule. Waiver is the intentional relinquishment of a known right, done with the intent to forever be deprived of its benefits. *Spann v. Lovett & ⌊7Co.*, 2012 Ark. App. 107, 389 S.W.3d 77. It may occur where a person takes action that is inconsistent with the right or his intention to rely on it and is ordinarily a question of fact. *Id.* Additionally, a party cannot complain of action he has induced, consented to, or acquiesced in. *Neel v. Citizens First State Bank of Arkadelphia*, 28 Ark.App. 116, 771 S.W.2d 303 (1989). Rule 26(b)(5), which addresses situations where a party inadvertently discloses information without intending to waive a claim of privilege or attorney work product, does not apply because this disclosure was not inadvertent.

■ Even if Rule 26(b)(4)(B) had applied, appellee's use of Holland as an expert was within the exception to that rule, which permits discovery upon a showing of exceptional circumstances under which it is impractical for the party seeking discovery to obtain facts or opinions on the same subject by other means. Appellee's attorney informed the trial court that he was unable to obtain another expert to testify about the repairs. Appellee testified that he had called at least ten different contractors that built chicken houses to give him an estimate of the cost of repairs and that they had all turned him down after he told them about appellant's involvement. Additionally, the trial court made sure that the jury was not informed that appellant had procured Holland's opinion as a consulting witness and had chosen not to call him as a witness. *See Ark. State Highway Comm'n v. Johnson*, 300 Ark. 454, 780 S.W.2d 326 (1989). The trial court did not abuse its discretion in this ruling, and we affirm on this issue.

In its second point on appeal, appellant argues that the trial court erred in permitting appellee to present evidence of lost profits, which it contends are consequential damages that ⌊8may only be awarded if they were within the reasonable contemplation of the parties (the "tacit-agreement" test). Appellant contends that there was no breach and that lost profits were not within the reasonable contemplation of the parties in this case because they did not agree on a date of completion; therefore, the trial court should have granted its motion for directed verdict or JNOV. Appellant further contends that appellee's proof of lost-profit damages was legally insufficient because the calculations

were based upon speculation; that this business was a new type of project that Tyson had never done before; and that appellee's calculations, which were based upon his first year in business, were inadequate because they did not cover a long-enough period of time. We disagree.

A directed-verdict motion is a challenge to the sufficiency of the evidence, and when reviewing the denial of a motion for a directed verdict, we determine whether the jury's verdict is supported by substantial evidence. *Spann, supra.* The same rule applies to motions for JNOV. *Gassman v. McAnulty,* 2009 Ark. App. 471, 325 S.W.3d 897. Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without having to resort to speculation or conjecture. *Spann, supra.* When determining the sufficiency of the evidence, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.* We do not try issues of fact but examine the record to determine whether there is substantial evidence to support the jury's verdict. *Id.* Thus, when testing the sufficiency of the evidence on appellate review, we need only consider the testimony of appellees and evidence that is most favorable to appellees. *Id.* We defer to the jury's resolution of the issue unless we can say that there is no reasonable probability to support the appellee's version. *Id.*

The evidence supported appellee's position that the parties agreed that four houses would be completed first. Questions of fact relating to the formation of contracts are for the trier of fact to determine, *Ingersoll–Rand Co. v. El Dorado Chem. Co.,* 373 Ark. 226, 283 S.W.3d 191 (2008), and conclusions concerning the true intent of the parties to the agreement primarily involve issues of fact. *Cobren v. Anderson,* 2011 Ark. App. 477, 385 S.W.3d 319. Whether the parties agreed that appellant was to first build four houses to completion before beginning the other three was a question of fact. *Taylor v. George,* 92 Ark.App. 264, 212 S.W.3d 17 (2005). A court may look to the conduct of the parties to determine their intent and to give substance to indefinite terms of a contract. *Id.*

Sharon Wadkins testified that she insisted to Henry Quinn that she would accept appellant's bid only if it would agree to build four houses to completion before building the remaining three houses, so she could have the birds from Tyson in place in the first four houses and be drawing income; this schedule would generate a quicker stream of income and reduce the amount of interest on the loan. Wadkins also stated that, in her twenty-five years as a banker, she had seen this type of transaction handled this way in the past.

Further, the contract's failure to specify a completion date was not significant. The rule is well established that, where there is no provision as to the time of the performance of the contract, the law implies that it must be performed within a reasonable time. *Id.* What would be a reasonable time depends upon the intention of the parties at the time the contract was made, the facts and circumstances surrounding its making, or, in general, what was contemplated by the parties at the time. *Id.* Both Henry Quinn and Randy Acker testified that a reasonable time frame to build a chicken house was three weeks. Sharon Wadkins stated that Quinn had told her that appellant would start on the project with a big crew and complete it quickly. Thus, the jury had before it evidence of a reasonable time frame in which the houses could have been completed.

■ Additionally, under the facts of this case, the lost-profit damages were not consequential damages. In general, damages recoverable for breach of contract are those damages that would place the injured party in the same position as if the contract had not been breached. *Deck House, Inc. v. Link,* 98 Ark.App. 17, 249 S.W.3d 817 (2007). Consequential damages are such damages, loss, or injury as does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such act. *Id.* Thus, lost profits have been held to be consequential damages when they do not flow directly and immediately from breach of a contract but flow from some consequence or result of the breach. *Id.* In order to recover consequential damages, a plaintiff must prove more than the defendant's mere knowledge that a breach of contract will entail special damages to the plaintiff; it must also appear that the defendant at least tacitly agreed to assume responsibility. *Id.* However, lost profits are not always consequential damages; sometimes, they may be the natural, proximate result of a breach of contract, and in such a case, the "tacit-agreement" rule does not apply. *Id.* Here, Sharon Wadkins's testimony demonstrated that the lost profits were the natural, proximate result of appellant's breach of its agreement to first build four houses before commencing work on the other three houses.

■ We also hold that the evidence of lost-profit damages offered by appellee was sufficiently reliable. While lost profits will not be allowed as damages if the trier of fact is required to speculate as to the fact or amount of profits, less certainty is required to prove the amount of lost profits than is required to show that profits were lost. *Spann, supra.* If it is reasonably certain that profits would have result-

ed had the contract been carried out, then the complaining party is entitled to recover. *Id.* Loss may be determined in any manner that is reasonable under the circumstances. *Id.* The fact that a party can state the amount of damages he suffered only approximately is not a sufficient reason for disallowing damages if, from the approximate estimates, a satisfactory conclusion can be reached. *Id.* It has also been held that damages may be approximated, that a damage figure will be upheld if an amount approximating that figure can be ascertained from the evidence, and that a damage award need not correspond in amount to the proof adduced by either party. *Id.* When, from the nature of the case, the amount of damages cannot be estimated with certainty, or only a part of them can be estimated, the question should go to the jury. *Id.*

■ Sharon Wadkins, who is a senior vice president of lending (primarily commercial) with Community National Bank in Waldron, testified that she had been in that business for twenty-five years; that she had dealt with projects like the one involved in this case; and that she had personally operated chicken houses. The trial court believed that, based upon her experience as a banker and as an operator of chicken houses, while dealing with Tyson and other companies, she had acquired sufficient experience to formulate an opinion about appellee's lost profits. Wadkins stated that the "grow-out" period with Tyson was thirty-eight days per flock of birds, at which time Tyson would pick them up and, soon after, send a check and put in a new batch of birds. Wadkins stated that, after calculating the gross income from each batch, less twenty-five percent in expenses, the profit should have been $28,714 per flock. She testified that appellant's delay probably caused appellee to lose the income from two, possibly

three, batches of chickens. She stated that for a loss of two flocks, the lost profits would have been $57,428.57. Further, Wadkins estimated the additional interest incurred by appellant's delay at $14,441.18. Appellee testified that he calculated his lost profits by looking at the first three batches that he had produced in 2006, subtracting expenses from his gross income. He stated that, because appellant did not build four houses first before completing the next three houses, he had lost either $63,264.36 for two batches or $94,896.54 for three batches of chickens. Thus, there was substantial evidence to support the jury's award of lost-profit damages, and we affirm on this point.

In its third point, appellant argues that the trial court abused its discretion in refusing to grant its motion for new trial based on the cost of repairs under Arkansas Rule of Civil Procedure 59(a)(6), which provides that a new trial may be granted when the verdict is clearly contrary to the preponderance of the evidence. Appellant contends that it substantially performed under the contract and was, therefore, entitled to recovery of the contract price, less the cost of repairs as established by appellee.[1] Arkansas Rule

of Civil Procedure 59(a) (2011) provides that a court may grant a new trial for any of several enumerated grounds materially affecting the substantial rights of a party, including when the verdict or decision is clearly contrary to the preponderance of the evidence or is contrary to the law. The trial court's discretion to grant a new trial under Rule 59 is necessarily broad and will not be overturned on appeal in the absence of an abuse of discretion. *Williams v. Liberty Bank*, 2011 Ark. App. 220, 382 S.W.3d 726. Given the standard of review, the trial court's determination to grant or deny a motion for new trial is almost never overturned on appeal. *Id.*

Appellant misunderstands the jury verdict. The trial court interpreted the verdict as providing that appellant *was* entitled to the $68,307 due under the contract and that the jury found that appellee's total damages were $136,614, against which the $68,307 was to be offset; thus, the remainder of $68,307 was the amount due to appellee. Of the net verdict, the jury attributed $34,716 to the cost of repairs and $33,591 to lost profits. Therefore, it is apparent that the jury found that appellant *did* substantially perform and that it was entitled to $68,307; however, it

---

1. When a contractor is in default by having failed to complete the contract, he can recover in spite of his breach if his performance was sufficiently substantial. *Roberts Contracting Co. v. Valentine–Wooten Rd. Pub. Facility Bd.*, 2009 Ark. App. 437, 320 S.W.3d 1. If omissions or deviations from the contract are inadvertent or unintentional; are not due to bad faith; do not impair the structure as a whole; and are remediable without doing material damage, substantial performance permits the contractor to be compensated, with deductions from the contract price. *Id.* Substantial performance cannot be determined by a mathematical rule relating to the percentage of the cost of completion, and there is no precise formula to use. *Id.* In the case of a building contract, the difference may be in quality of workmanship and materials. *Id.*

The issue of substantial performance is a question of fact. *Id.*

In determining whether performance is substantial, the following considerations are significant: (1) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (4) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances, including any reasonable assurances; and (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. *Id.*

also determined that appellee's total damages were double that amount, leading to a judgment in favor of appellee. Because, as discussed above, the evidence offered by appellee supports the $136,614 amount in total damages, the trial court did not abuse its discretion in denying a new trial on this basis.

In its fourth point, appellant argues that the trial court erred in denying its request to enter into evidence appellee's statements about compromise contained in two letters. In an October 7, 2006 letter to Henry Quinn (Plaintiff's Exhibit 22) appellee stated:

Regarding to our conversation over the phone earlier today, I believe someone is interfering with our goal to accomplish this insulation matter to meet the term of the two contracts rated R–19. Someone was instructing the insulation crew to blow in certain number of bags into the attic, instead of blowing in enough insulation throughout the attic rated R–19. You know, I wanted to pay Randy Acker as bad as he want his security payment. Therefore, you need to make it clear to the insulation crew that they have to do it right according to the term of the contract.

I only checked House Number 3, 4, 5, 6, within five feet from the corner the insulation is about 3 to 4 inches thick. I have asked them to go back to blow in more insulation to 5 thick, instead they call Steve and Steve called you to B.S. a deception method. The insulation crew has until Wednesday October 11, 2006. Also, since the lien had been filed, I need a copy of filed release of lien than I will release the security payment.

On December 4, 2006, appellee sent the following letter (Plaintiff's Exhibit 23) to appellant's attorney:

In regarding to your imprudent "as is" letter, your client's scatterbrained

that created the problem to begin with, don't tell me about breach of contract. Your client blew in additional 843 bags of insulation in the attics; still your client did not full fill the terms of the contracts. In every house, about one to two feet from the corners the insulation is about 3 inches thick.

I am a man of honor, I told Henry Quinn that upon receiving an original certified Release of Lien and I will release the full and final payments of $29,275.00 and $39,032.00. I am sure that Arvest Bank wanted a copy also.

The trial court permitted Plaintiff's Exhibit 22 to be entered into evidence in a redacted form and excluded Plaintiff's Exhibit 23. Appellant contends that it is entitled to a JNOV or a new trial because of this error.

Arkansas Rule of Evidence 408 (2011) provides:

Evidence of (1) furnishing, offering, or promising to furnish, or (2) accepting, offering, or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for, invalidity of, or amount of the claim or any other claim. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion if the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Appellant argues that it should have been able to introduce this evidence because appellee was able to state before the jury that it had filed a "false lien" against his property. It also argues that it had

wanted to use the letters to impeach appellee's testimony about the alleged defects in the buildings. Appellant states: "The evidence would have shown that Mr. Tran was satisfied with the performance by Acker to the extent whereby Mr. Tran was willing to pay the remaining contract price in order to fully satisfy the lien which was filed on his property." However, the attorney to whom appellee directed his December 2006 letter was not present to testify. Appellee took the position below and on appeal that, although he stated in the letters that he would make the payments due on the contract when the lien was released, he did not do so because the paperwork appellant sent him included a full release of all claims; this was not acceptable because he had never agreed to release his right to sue for lost profits resulting from the delay and for the defective construction.

Evidence of conduct or statements made in compromise negotiations are not admissible on the issue of liability. *Baugh v. Johnson*, 6 Ark.App. 308, 641 S.W.2d 730 (1982). Rule 408 does not prohibit such evidence when it is introduced for any other reason. *Ozark Auto Transp., Inc. v. Starkey*, 327 Ark. 227, 937 S.W.2d 175 (1997).

> The purpose of Rule 408 is to promote complete candor between the parties to the settlement negotiations but not to protect false representations. Thus, when a party has made a statement at trial which is inconsistent with a statement made during settlement negotia-

tions, the inference is that one of the statements is knowingly false.

*Missouri Pac. R.R. Co. v. Ark. Sheriff's Boy's Ranch*, 280 Ark. 53, 64, 655 S.W.2d 389, 395 (1983). Even if evidence is offered for a purpose other than those prohibited, and Rule 408 does not bar its introduction, that does not mean that the evidence is automatically admissible. *McKenzie v. Tom Gibson Ford, Inc.*, 295 Ark. 326, 749 S.W.2d 653 (1988). Such evidentiary rulings are within the sound discretion of the trial court and we will not set them aside absent a manifest abuse of that discretion. *Ozark, supra.*

We believe that the statements that appellee made in these letters were not demonstrably inconsistent with his testimony at trial and that their introduction would have served little purpose other than to demonstrate appellee's willingness to settle the claims; therefore, they were properly excluded under Rule 408. Because the trial court did not abuse its discretion in this ruling, we affirm it. *See Swindle v. Lumbermens Mut. Cas. Co.*, 315 Ark. 415, 869 S.W.2d 681 (1993).

Affirmed.

PITTMAN and WYNNE, JJ., agree.