Cite as 2022 Ark. 42

# SUPREME COURT OF ARKANSAS

No. CV-20-728

| | |
|---|---|
| KBX, INC.; STEVEN MICHAEL KEITH, SR., INDIVIDUALLY; STEVEN MICHAEL KEITH, JR., INDIVIDUALLY; JEFFREY SHAY SEBREE, INDIVIDUALLY<br><br>APPELLANTS<br><br>V.<br><br>ZERO GRADE FARMS, A PARTNERSHIP, ALSO D/B/A ISBELL FARMS; MARK ISBELL, INDIVIDUALLY; CHRIS ISBELL, INDIVIDUALLY; SHANE ISBELL, INDIVIDUALLY; JUDY ISBELL, INDIVIDUALLY; JEREMY JONES, INDIVIDUALLY; K&K FARM SERVICE, INC., ALSO D/B/A K&K FARM SERVICES; EDWARD SCHAFER & SONS, A PARTNERSHIP; RONALD SCHAFER AND ROGER SCHAFER, AS TRUSTEES OF THE EDWARD BURNARD SCHAFER Q-TIP TRUST; RONALD SCHAFER, INDIVIDUALLY; DEE ANNE SCHAFER, INDIVIDUALLY; CLIFFORD SCHAFER, INDIVIDUALLY; RACHEL SCHAFER, INDIVIDUALLY; ROGER SCHAFER, INDIVIDUALLY; PAMELA SCHAFER, INDIVIDUALLY; DONALD SCHAFER, INDIVIDUALLY; DONNA SCHAFER, INDIVIDUALLY; GARY HARDKE FARMS, A PARTNERSHIP; GARY HARDKE, INDIVIDUALLY; MELODIE HARDKE, INDIVIDUALLY, AND BIGFOOT AG, INC.<br><br>APPELLEES | **Opinion Delivered:** February 24, 2022<br><br>APPEAL FROM THE LONOKE COUNTY CIRCUIT COURT [NO. 43CV-14-410]<br><br>HONORABLE SANDY HUCKABEE, JUDGE<br><br><br><br><br><br><br><br>REVERSED AND DISMISSED IN PART; AFFIRMED IN PART; REVERSED AND REMANDED IN PART. |

JOHN DAN KEMP, **Chief Justice**

Appellants KBX, Inc. ("KBX"); Steven Michael Keith, Sr., individually ("Steven"); Steven Michael Keith, Jr., individually ("Michael"); Jeffrey Shay Sebree, individually ("Shay") (collectively "appellants") (Steven, Michael, and Shay collectively as "the KBX Individuals") appeal a Lonoke County Circuit Court order reflecting a jury verdict awarding $5,954,198.57 in compensatory damages, jointly and severally, against KBX, the KBX Individuals, Turner Grain, Inc. ("TGI"), and the estate of Jason Coleman ("Coleman" and "Coleman's estate"), and $6,074,196.00 in punitive damages, jointly and severally, against Steven, TGI, and Coleman to appellees Zero Grade Farms, a partnership, also d/b/a Isbell Farms ("Zero Grade"); Mark Isbell, individually; Chris Isbell, individually; Shane Isbell, individually; Judy Isbell, individually; Jeremy Jones, individually; K&K Farm Service, Inc., also d/b/a K&K Farm Services ("K&K"); Edward Schafer & Sons, a partnership ("Schafer"); Ronald Schafer and Roger Schafer, as trustees of the Edward Burnard Schafer Q-Tip Trust; Ronald Schafer, individually; Dee Anne Schafer, individually; Clifford Schafer, individually; Rachel Schafer, individually; Roger Schafer, individually; Pamela Schafer, individually; Donald Schafer, individually; Donna Schafer, individually; Gary Hardke Farms, a partnership ("Hardke"); Gary Hardke, individually; Melodie Hardke, individually; and Bigfoot Ag, Inc. (collectively "the farmers").[1] For reversal, appellants raise four arguments,

---

[1]KBX and the KBX Individuals are the only appellants in this case. TGI, Coleman's estate, and the other named defendants did not appeal. Coleman died during the course of the litigation on January 7, 2019.

2

but only two are necessary to dispose of this case. We reverse and dismiss the judgment as to KBX and the KBX Individuals. We affirm the circuit court's dismissal of KBX's counterclaims. We also reverse the circuit court's award of attorney's fees and remand for recalculation of an award consistent with this opinion.

I. *Background*

A. Factual History

This case involves the farmers' dispute with KBX, a grain exporter and merchandiser, and the KBX Individuals over a series of written contracts ("Farmers Grain Contracts") for the purchase of rice.

By 2014, TGI, a grain merchandiser,[2] had established a business practice of quoting rice prices that were well above the market value in order to procure business. TGI had engaged in the practice of offering its customers above-market prices and then would use the profits from its corn and freight contracts to cover the losses from its rice transactions. Certain individuals in the rice industry had alerted KBX of TGI's business practice. In 2014, TGI arranged to purchase the farmers' rice.

In July 2014, the farmers entered into the Farmers Grain Contracts with TGI to sell their rice at a specified price per bushel. Pursuant to the Farmers Grain Contracts, the farmers were designated as the "Seller," TGI was designated as the "Broker," and an undisclosed third party was designated as the "Purchaser." The Farmers Grain Contracts

---

[2]Coleman, Dale Bartlett, and Christopher Taylor worked for TGI.

stated that "[t]his agreement is entered into between Turner Grain, Inc. (Broker) and Seller of rice (Seller)." The farmers executed their contracts "F.O.B. farm," "F.O.B. Delivered West Memphis," or "F.O.B. Bins Carlisle." The farmers agreed to deliver specified quantities of rice, and in exchange, TGI agreed to pay the farmers a collective amount totaling $5,954,198.57. The majority of the farmers' rice was delivered to Consolidated Grain and Barge Company ("CBG") in West Memphis where the rice was placed on barges. KBX was not a party to the Farmers Grain Contracts.

While TGI was listed as a broker in the Farmers Grain Contracts, TGI was also known in the industry as a "simultaneous" or "back-to-back" dealer or merchandiser. Once TGI took possession of the rice, it then sold the farmers' rice to KBX. The record reveals, in a spreadsheet trial exhibit, that at least 39 separate contracts existed between KBX and TGI concerning the farmers' rice. During the summer of 2014, KBX paid TGI in excess of $28 million in the form of wire transfers and checks, and $5,954,198.57 of that $28 million was allocated as payment in full for the farmers' rice. Ultimately, TGI collapsed on August 12, 2014. While KBX had paid TGI for the rice, TGI in turn had failed to pay the farmers in full.

On August 18, 2014, after TGI's collapse and prior to filing the lawsuit, the farmers served preservation letters on KBX and Steven and instructed appellants to preserve all written and electronic documentation about the rice-sales transactions for purposes of discovery. The preservation letters covered all documentation and communications from May 15, 2014, through August 18, 2014.

4

## B. Procedural History

On August 22, 2014, the farmers filed suit in Lonoke County Circuit Court seeking payment for the delivery of their respective rice in July and August 2014. In their sixth amended complaint ("operative complaint"), dated November 26, 2019, the farmers named the following parties as defendants: Agri-Petroleum Sales, LLC; Agribusiness Properties, LLC; Brinkley Truck Brokerage, LLC; Christopher Taylor, individually; Coleman Duck Club, LLC; Coleman Transportation, LLC; Dale Bartlett, individually, Gerald W. Loyd; Ivory Rice, LLC; Anna Hurst, special administrator of the estate of Jason Coleman, deceased; Jeffrey Shay Sebree, individually; KBX, Inc.; LJTC, LLC; NEA Truck Brokers, LLC; Neauman Coleman, individually; Neauman Coleman & Co. LLC; Rice America, Inc.; Rice Arkansas, Inc.; Steven Michael Keith, Jr., individually; Steven Michael Keith, Sr., individually; Turner Commodities, Inc.; Turner North, LLC; and Turner Grain, Inc., d/b/a Turner Grain.[3]

In their operative complaint, the farmers alleged that TGI had acted as a broker between the farmers and KBX. According to the farmers, TGI and KBX created a business

---

[3]On May 10, 2017, the circuit court entered an order dismissing without prejudice the following defendants: Agri-Petroleum Sales, Coleman Duck Club, Coleman Transportation, NEA Truck Brokers, Neauman Coleman, Neauman Coleman & Co., Rice America, and Rice Arkansas. Subsequently, on May 17, 2017, the circuit court entered a corrected order stating that Agri-Petroleum Sales, LLC had been dismissed in error and remained a defendant in the action. Defendant Gerald Loyd filed for Chapter 7 bankruptcy in bankruptcy court and was dismissed without prejudice by the circuit court in an order dated February 12, 2018. At trial in 2020, these defendants were not named as defendants in Jury Instruction No. 9. On February 20, 2020, the circuit court also dismissed Don Kittler Jr. as a plaintiff.

practice wherein KBX used TGI to act as its broker and its payment agent in negotiated contracts. Specifically, the farmers asserted eleven causes of action: (1) breach of contract by KBX in failing to fulfill its obligations under the contracts with the farmers for rice it agreed to purchase through its broker, TGI; (2) alternatively, breach of contract by all other defendants under the alter-ego theory for failure to fulfill their obligations under the contracts with the farmers; (3) conversion by KBX in that KBX had refused and failed to pay what was owed to the farmers, and that KBX exercised dominion and control over the farmers' property inconsistent with their rights; (4) conversion of rejected rice by KBX; (5) in the alternative, conversion by all other defendants; (6) fraud (deceit) through false representation made to induce the farmers to enter the contracts; (7) in the alternative, constructive fraud; (8) theft by deception in their dealing with the farmers; (9) violation of the Arkansas Deceptive Trade Practices Act; (10) civil conspiracy; and (11) unjust enrichment. In their prayer for relief, the farmers sought, inter alia, monetary damages, including punitive damages, against all defendants. The farmers also demanded a trial by jury. KBX counterclaimed against the farmers for abuse of process, interference with a contractual relationship or business expectancy, defamation, perjury under the civil-action-by-crime-victim statute, and conspiracy.

The parties filed numerous motions throughout the litigation. During discovery, the farmers sent interrogatories to appellants to confirm that appellants had preserved the documents set forth in the preservation letters. According to Alvey Matlock, an employee of Guardian Forensics and Data Recovery, the KBX Individuals, between August 1, 2013, and

6

January 1, 2015, sent and received a total of 46,219 text messages. Out of those 46,219 messages, 32,316 were attributed to Shay, 11,927 to Michael, and 1,976 to Steven. But Shay produced only 333 of the messages while Michael produced 56, and Steven produced zero. As a result, the farmers filed a motion for contempt and sanctions against KBX. During a subsequent hearing, the circuit court orally granted the farmers' motion for a finding of spoliation against KBX for the intentional deletion of cell-phone data that was within the scope of permissible discovery. On June 2, 2017, the circuit court entered an order granting the farmers' motion for a finding of spoliation against KBX. Two years later, on May 30, 2019, the circuit court entered an order granting the farmers' motion for a finding of spoliation against the KBX Individuals.

The case proceeded to trial. The farmers nonsuited their claims of breach of contract, theft by deception, and deceptive trade practices. On February 20, 2020, the circuit court entered an order granting the farmers' motion to nonsuit Count 1 (breach of contract by KBX) and Count II (breach of contract by other defendants). On February 21, the circuit court entered an order granting the farmers' motion to nonsuit Count VIII (theft by deception) and Count IX (violation of the Arkansas Deceptive Trade Practices Act). The farmers proceeded to trial only on the remaining tort claims and a claim of unjust enrichment.

From January 31 through February 24, 2020, the circuit court conducted a jury trial during which thirty-three witnesses testified and hundreds of exhibits were introduced into evidence. Of those thirty-three witnesses, the following farmers testified. First, Gary Hardke

of Hardke Farms testified that Coleman approached him about purchasing his rice. Hardke stated that he had never had any dealings with Coleman before July 2014. He testified that he entered into a contract on July 7, 2014, for 90,000 bushels of rice at $7.15 per bushel F.O.B. (Free on Board) farm. He stated that once the rice left his farm, it went to CBG in West Memphis. Hardke's contract with TGI listed Hardke as the seller, TGI as the broker, and the purchaser was unidentified. According to Hardke, Coleman stated that KBX was buying his rice. Hardke further testified that he was to receive $691,478.07 for his 96,710.22 bushels of rice, but he never received payment. Under cross-examination, when counsel asked, "[Y]ou never had any contact with these people, right, . . . no phone calls, no meetings, no emails, no texts, no contact whatsoever," Hardke replied, "No." KBX counsel asked, "Did Jason Coleman ever tell you that KBX paid him for your rice?" Hardke replied, "No."

Mark Isbell of Zero Grade Farms testified that Coleman called his father, and they had a meeting with Coleman at their shop on the farm on or about June 27, 2014. He testified that Zero Grade Farms had no prior dealings with either TGI or KBX. When asked if he knew about TGI and Coleman, Isbell responded, "Prior to that meeting, I think we'd cross paths, maybe, briefly at a—at like a rice conference or something, but I didn't know really anything about [Coleman] prior to that." Isbell testified that he executed a series of contracts with Coleman for 310,836.86 bushels, and Zero Grade started shipping rice on July 8, 2014. He testified that he expected $2,330,337.98 for the rice pursuant to his contracts. He testified that "ten, 12 days into the . . . first set of contracts, Jason became a little more difficult to get a hold of." Isbell testified that he personally went to KBX's office

8

on August 12 or 13 and showed Shay a spreadsheet that he had created indicating the loads that Zero Grade had shipped to the KBX barges at CGB, asked that KBX pay the farmers directly, and requested that KBX give back the rice that was on the barges. However, on cross-examination, Isbell acknowledged that no one from KBX had been present at the farm meeting, no one had gotten KBX on a phone call for that meeting, no one had written a letter to KBX about that meeting, and there had been no communication with KBX "at that time [of the execution of the contracts]." Isbell further stated that, with respect to the negotiation of the contract, no one at Zero Grade was communicating with anyone "other than or outside TGI." When asked whether he had communicated with KBX during the contracting, he stated that "[o]ther than crossing paths potentially at conferences, personally, no."

Ronald Schafer testified that his family's business, Edward Schafer & Sons, was contacted by Coleman in July 2014 about purchasing rice. Schafer stated that Coleman "sent a guy over there to—to me to sign the contract, and I signed the contract, and we immediately started shipping rice." Schafer testified that "[the contract] was from Turner Grain, Inc., and it had a 7.25 price on there." According to Schafer, his farm was to ship 182,283.02 bushels at $7.25 for a total of $1,321,554.07. Schafer testified that the only contact he had with KBX was when he "called up Shay Sebree [after the collapse of TGI] and asked him for some of my tickets 'cause I . . . couldn't get any tickets from anybody." On cross-examination, when asked whether, during the process of negotiating with Coleman, he had talked to anyone at KBX, Schafer replied, "Not—not at that time."

9

Jon Trickey of K&K testified that Chris Taylor of TGI approached him in July 2014 about purchasing his rice. Trickey stated that his contract reflected a purchase of 250,000 bushels at $7.25 per bushel. Trickey testified that ultimately 242,872.89 bushels were removed from the K&K storage facilities and that he expected to receive $1,760,828.45 for the rice pursuant to the contract. During cross-examination, Trickey confirmed that payment was made from TGI—not KBX. Trickey further acknowledged that he had no contact with "the three [KBX] individuals" about the contract. Additionally, Don Kittler of K&K testified that K&K was in the business of buying and selling grain. Kittler stated that he had not been paid in full for the rice that he delivered to the barges in July 2014. On cross-examination, he admitted that he had received partial payment from TGI, but the check had bounced. Also on cross-examination, Kittler testified that he had heard the farmers' expert state that KBX had paid for all the grain it had purchased from TGI. When counsel asked Kittler if he wanted KBX to pay again, he responded, "I hadn't been paid for my grain."

Dr. Gail Cramer, the farmers' expert in agricultural economics, testified that he had reviewed all the settlement and payment information. Dr. Cramer stated in the affirmative that after reviewing the payment information, he knew "that KBX had paid on all of those contracts." Dottie Morrison, KBX's bookkeeper, testified that her accounting records had been made available to the farmers. She testified that she had reviewed the transactions, payments, and settlement sheets. She testified that KBX had paid TGI for "every bit of [the farmers' rice.]" Appellants' expert Cheryl Shuffield, a certified public accountant, testified that she and her accounting team verified that KBX had paid TGI the money that it owed

10

pursuant to its contracts with TGI. When asked, "Is there any doubt in your testimony . . . that KBX paid Turner Grain for the rice that it purchased[,]" Shuffield responded, "There is no doubt in my mind that they did."

After the farmers rested and again at the close of the testimony, appellants moved for a directed verdict on all claims against them. They asserted that substantial evidence did not support the farmers' claims for deceit, constructive fraud, conversion, conspiracy, and unjust enrichment. The circuit court denied both motions. On the issue of spoliation, the jury was instructed that it could draw an adverse inference against appellants if it found that appellants had, in fact, destroyed text messages or other data.

On February 25, 2020, the jury completed its interrogatories and found that the farmers had proved at least one of their claims of deceit, constructive fraud, conversion, conspiracy, and unjust enrichment against KBX, the KBX Individuals, TGI, and Coleman's estate. The jury awarded $5,954,198.57 in compensatory damages, the value of the rice according to the terms of the Farmers Grain Contracts, and allocated the following percentages of fault for the damages to Zero Grade, Hardke, K&K, and Schafer: 1% to KBX, 3% to Steven, 3% to Michael, 1% to Shay, 46% to TGI, 46% to Coleman's estate, 0% to Bartlett, 0% to Taylor, 0% to Gavilon Grain LLC as a nonparty, and 0% to TGMI as a

nonparty.[4] The jury also returned a punitive-damages verdict against Steven, Coleman's estate, and TGI in the amount of $6,074,196.00. KBX and the other KBX Individuals were not found liable for punitive damages.

On March 19, 2020, the circuit court entered a judgment reflecting the jury's award of compensatory damages, jointly and severally, against KBX, the KBX Individuals, TGI, Coleman's estate, Agri-Business Properties LLC, Agri-Petroleum Sales LLC, Brinkley Truck Brokerage LLC, Ivory Rice LLC, LJTC LLC, Turner Commodities Inc., and Turner North LLC, in favor of the farmers in the total amount of $5,954,198.57, plus prejudgment and postjudgment interest. The circuit court also entered a judgment for punitive damages, jointly and severally, against Steven, TGI, Coleman's estate, Agri-Business Properties LLC, Agri-Petroleum Sales LLC, Brinkley Truck Brokerage LLC, Ivory Rice LLC, LJTC LLC, Turner Commodities Inc., and Turner North LLC, in favor of the farmers in the total amount of $6,074,196.00, plus postjudgment interest.

---

[4]The jury found that Agri-Business Properties LLC, Ivory Rice LLC, Brinkley Truck Brokerage LLC, Turner North LLC, Turner Commodities, Inc., LJTC LLC, and Agri-Petroleum Sales, LLC, were liable for TGI's acts under a piercing-the-veil theory.

One of the original defendants, Turner Grain Merchandising, Inc. ("TGMI"), later filed for Chapter 11 bankruptcy protection. After the circuit court dismissed TGMI without prejudice, the case was removed to United States Bankruptcy Court. Following a hearing, the bankruptcy court entered an order on September 4, 2015, ruling that "state law issues predominate over bankruptcy issues" and concluding that it "should abstain from hearing the State Court Lawsuit [pursuant to 28 U.S.C. section 1334(c)(1)], and remand the State Court Lawsuit to the Circuit Court of Lonoke County, Arkansas." Subsequently, in December 2015, the circuit court dismissed TGMI without prejudice from the lawsuit. At trial, the jury was given an instruction on TGMI as a nonparty.

Appellants filed a motion for judgment notwithstanding the verdict on April 2, 2020. The circuit court did not rule on the JNOV motion, and it was deemed denied on May 4, 2020. On May 20, the circuit court entered a judgment that included a certificate pursuant to Rule 54(b) of the Arkansas Rules of Civil Procedure. KBX and the KBX Individuals timely filed their notices of appeal.

The circuit court also entered a fee judgment and assessed attorney's fees and costs, jointly and severally, against KBX and the KBX Individuals in the amount of $526,818.93, as a sanction for alleged spoliation of evidence. KBX and the KBX Individuals timely appealed the fee judgment.

## II. *Jury Verdict*

While appellants raise four arguments on appeal, we begin our analysis with their second argument concerning whether substantial evidence supports the jury's verdict on the farmers' five claims of conversion, deceit, constructive fraud, conspiracy, and unjust enrichment.

## A. Standard of Review

We will reverse the denial of a motion for directed verdict or a motion for JNOV if there is no substantial evidence to support the jury's verdict, and the moving party is entitled to judgment as a matter of law. *Ark. Realtors Ass'n v. Real Forms, LLC*, 2014 Ark. 385, at 9, 442 S.W.3d 845, 851. Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. *Id.*, 442 S.W.3d at 851. It is not our place to try issues of fact; rather, we simply review the record for substantial evidence

13

to support the jury's verdict. *Id.*, 442 S.W.3d at 851. In determining whether there is substantial evidence, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.*, 442 S.W.3d at 851. A motion for directed verdict should be denied when there is a conflict in the evidence, or when the evidence is such that fair-minded people might reach different conclusions. *Id.*, 442 S.W.3d at 851. Stated another way, a motion for a directed verdict should be granted only when the evidence viewed is so insubstantial as to require the jury's verdict for the party to be set aside. *Conagra, Inc. v. Strother*, 340 Ark. 672, 675, 13 S.W.3d 150, 152 (2000).

The same standard holds true for a motion for judgment notwithstanding the verdict. *Carter v. Cline*, 2011 Ark. 474, at 10, 385 S.W.3d 745, 752. A circuit court may enter a judgment notwithstanding the verdict only if there is no substantial evidence to support the verdict and the moving party is entitled to judgment as a matter of law. *Id.*, 385 S.W.3d at 752.

## B. Conversion

KBX argues that substantial evidence does not support the jury's verdict because it never wrongfully possessed or controlled any of the farmers' property. The KBX Individuals contend that the farmers' claims for conversion of rice are based solely on the allegations that KBX had purchased rice from TGI with the knowledge that TGI had offered the farmers an above-market price for their rice and that TGI never paid them. They assert that the farmers failed to present evidence that the KBX Individuals "personally exercised dominion

and control over Plaintiffs' property." The farmers respond that substantial evidence supported the jury's verdict.

Conversion is a common-law tort action for the wrongful possession or disposition of another's property. *Hartness v. Nuckles*, 2015 Ark. 444, at 9, 475 S.W.3d 558, 565. To establish liability for the tort of conversion, a plaintiff must prove the defendant wrongfully committed a distinct act of dominion over the property of another, which is a denial of, or is inconsistent with, the owner's rights. *Id.*, 475 S.W.3d at 565. If the defendant exercises control over the goods in exclusion or defiance of the owner's rights, it is a conversion, whether it is for defendant's own use or another's use. *Id.*, 475 S.W.3d at 565.

In the case at bar, the evidence at trial revealed back-to-back transactions—that the farmers contracted with TGI for the purchase of their rice, and TGI in turn contracted with KBX for the purchase of the same rice. The record is devoid of proof that either KBX or the KBX Individuals wrongfully committed a distinct act of dominion over the rice, particularly when the farmers themselves delivered the rice "FOB [Plaintiffs' farms or West Memphis]" under the terms of their contracts.

Moreover, the record reveals that neither KBX nor the KBX Individuals converted money. The record shows that KBX purchased the rice from TGI for $5,954,198.57 but that TGI failed to pay the farmers. Cramer, Morrison, and Shuffield all testified that KBX had paid TGI for the farmers' rice. Ultimately, KBX's payments to TGI for the farmers' rice did not reach the hands of the farmers, pursuant to the Farmers Grain Contracts. Any possible adverse inference made by the jury from deleted text messages does not negate this fact.

15

Further, there was no evidence that the KBX Individuals personally received payment for the farmers' rice. We therefore hold that substantial evidence does not support the jury's verdict on the farmers' conversion claim.

## C. Deceit

Next, KBX challenges the jury's verdict on the farmers' claim of deceit. KBX argues that the farmers failed to present evidence at trial of any representation by KBX to the farmers, "much less a false representation of material fact." The KBX Individuals contend that the farmers failed to present any evidence of deceit because they never had any communications with the farmers. The farmers respond that "[t]here was substantial evidence [KBX and the KBX Individuals] made false representations of material fact or failed to disclose material facts they had a duty to disclose and that the [farmers] relied on the representations or nondisclosures." In their argument, the farmers emphasize that TGI and KBX had "worked in tandem."

Under Arkansas law, the tort of deceit, fraud, or misrepresentation consists of the following five elements: (1) that the defendant made a false representation of material fact; (2) that the defendant knew that the representation was false or that there was insufficient evidence upon which to make the representation; (3) that the defendant intended to induce action or inaction by the plaintiff in reliance upon the representation; (4) that the plaintiff justifiably relied on the representation; and (5) that the plaintiff suffered damage as a result of the false representation. *Muccio v. Hunt*, 2016 Ark. 178, at 4–5, 490 S.W.3d 310, 312–13.

16

Here, the farmers have failed to prove the first element of deceit that KBX or the KBX Individuals have made a false representation of a material fact. In their own testimony, the farmers revealed that they had no contact with the KBX Individuals prior to entering into their Farmers Grain Contracts. Hardke testified that he had "no phone calls, no meetings, no emails, no texts, no contact whatsoever" with the KBX Individuals. Isbell testified that "other than crossing paths potentially at conferences," he had no contact with the KBX Individuals prior to entering the contract. Trickey of K&K testified that his only contact with KBX was in 2008 on a different business matter. Both Schafer and Isbell testified that they had talked to Shay after TGI's collapse, but those communications had no bearing on the farmers' claim of deceit. While the farmers testified that they primarily communicated with Coleman, any adverse inferences made by the jury do not satisfy the elements of deceit in this instance. Thus, without any evidence of the first element of deceit in the form of a false representation by KBX or the KBX Individuals to the farmers, we hold that substantial evidence does not support the jury's verdict on deceit.

## D. Constructive Fraud

KBX also argues that substantial evidence does not support the jury's verdict for constructive fraud. Specifically, KBX contends that the farmers failed to introduce evidence that (1) they had a relationship with KBX and (2) KBX made a misrepresentation to the farmers or failed to disclose any information to them. The KBX Individuals contend that there was no evidence of a special knowledge or relationship between the farmers and the KBX Individuals that would have given rise to a duty to warn. The farmers respond that the

17

jury's verdict on constructive fraud is supported by substantial evidence. The farmers claim that, given KBX's knowledge and coordination with TGI, substantial evidence supported the farmers' constructive-fraud claim.

Constructive fraud, as opposed to actual fraud, does not include the elements of actual dishonesty or intent to deceive. *Born v. Hosto & Buchan, PLLC*, 2010 Ark. 292, at 10, 372 S.W.3d 324, 332. It is defined as a breach of a legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others. *Id.*, 372 S.W.3d at 332.

With regard to the duty element of constructive fraud, the farmers testified that they did not have a relationship with anyone at KBX. They did not contract with KBX, and as previously noted, the farmers themselves testified that they did not have a relationship with anyone at KBX. Again, any adverse inferences made by the jury cannot support the farmers' claim. Thus, in the absence of a legal or equitable duty between the farmers and KBX and the KBX Individuals, we hold that the evidence presented at trial does not constitute substantial evidence to support the jury's verdict on constructive fraud.

## E. Conspiracy

Next, KBX argues that substantial evidence does not support the jury's verdict on conspiracy because the farmers failed to prove that KBX conspired with another party or acted with specific intent to harm the farmers. The KBX Individuals assert that they were not involved in a conspiracy to commit tortious acts. The farmers respond that there was substantial evidence of an agreement or understanding to commit intentional torts because

18

appellants "knew of and supported TGI's pricing scheme by silence and the propping up of TGI through, for example, large payments without adequate documentation."

A civil conspiracy is an intentional tort that requires a specific intent to accomplish the contemplated wrong. *Chambers v. Stern*, 347 Ark. 395, 404, 64 S.W.3d 737, 743 (2002). To prove a civil conspiracy, a plaintiff must show that two or more persons have combined to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive, or immoral, but by unlawful, oppressive, or immoral means, to the injury of another. *Dodson v. Allstate Ins. Co.*, 345 Ark. 430, 445, 47 S.W.3d 866, 876 (2001).

Here, the farmers failed to prove that KBX and the KBX Individuals conspired to commit an underlying tort to which civil conspiracy attached. As previously stated, we hold that substantial evidence does not support the jury's verdict on the farmers' claims of deceit, constructive fraud, and conversion. Thus, in the absence of an agreement to commit an underlying intentional tort, we hold that substantial evidence did not support the jury's verdict on the farmers' conspiracy claim.

### F. Unjust Enrichment

Last, KBX challenges the jury's verdict on the farmers' unjust-enrichment claim on two grounds. First, KBX argues that the circuit court erred as a matter of law in denying its motion for directed verdict and allowing the farmers' claim of unjust enrichment to be submitted to the jury. Specifically, KBX claims that the farmers' claim for unjust enrichment was governed by valid and enforceable written contracts between the farmers and TGI, and

19

as a result, the farmers were not, as a matter of law, entitled to pursue an unjust-enrichment claim against KBX. Second, KBX asserts that even if the farmers were entitled to pursue a claim of unjust enrichment, then the jury's verdict was not supported by substantial evidence. The KBX Individuals similarly contend that the claim for unjust enrichment fails. The farmers respond that the circuit court did not err in denying a directed verdict or JNOV because the Farmers Grain Contracts with TGI did not preclude a claim of unjust enrichment.

Unjust enrichment is an equitable doctrine. *First Nat'l Bank of DeWitt v. Cruthis*, 360 Ark. 528, 535, 203 S.W.3d 88, 93 (2005). It is the principle that one person should not be permitted unjustly to enrich himself at the expense of another but should be required to make restitution of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly. *Campbell v. Asbury Auto., Inc.*, 2011 Ark. 157, at 21, 381 S.W.3d 21, 36. The existence of a contractual relationship between the parties that addresses the subject in dispute generally precludes recovery on a theory of unjust enrichment. *Id.* at 22, 381 S.W.3d at 36–39. Quantum meruit is a claim for unjust enrichment that does not involve the enforcement of a contract. *Sisson v. Ragland*, 294 Ark. 629, 632, 745 S.W.2d 620, 622 (1988).

In *Servewell Plumbing, LLC v. Summit Contractors, Inc.*, 362 Ark. 598, 210 S.W.3d 101 (2005), a plumbing subcontractor filed suit against Summit, a general contractor, and Gables of Maumelle ("Gables"), a landowner, for breach of contract and unjust enrichment. Summit

moved to dismiss, which the circuit court granted, and Servewell appealed to this court. We affirmed the circuit court's dismissal, stating:

> Servewell argues that the rule barring recovery in quasi-contract where there is an express contract "has no application to claims against third parties." While there does not appear to be any Arkansas case law on this precise issue, the Second Circuit Court of Appeals has held that it is a "settled principle" that "the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the same subject matter." *See U.S. East Telecommunications, Inc. v. U.S. West Communications Services, Inc.*, 38 F.3d 1289, 1296 (2d Cir. 1994). The Second Circuit also noted that a subcontractor could recover from a landowner, even when a separate contract exists between the subcontractor and general contractor, *if* the owner has agreed to pay the general contractor's debt or if the circumstances surrounding the parties' dealings can be found to have given rise to an obligation to pay. *Id.* at 1298. In the instant case, however, there is no evidence of any such agreement between Summit and the Gables; therefore, this exception is not applicable, and the general rule—that one cannot recover in quasi-contract when an express contract exists—governs the matter. As such, the trial court did not err in dismissing Servewell's unjust enrichment claim against the Gables.

*Id.* at 612–13, 210 S.W.3d at 112.

The *Servewell* case is analogous to the case at bar. Like Servewell and Summit, the farmers and TGI were parties to the Farmers Grain Contracts. The farmers seeking unjust enrichment when there is an express contract "has no application to claims against third parties," *id.* at 612, 210 S.W.3d at 112, like KBX. Simply put, the existence of the Farmers Grain Contracts between TGI and the farmers precludes a claim for unjust enrichment against KBX and the KBX Individuals. Based on this precedent, we conclude that a quasi-contractual claim is barred when an express contract existed between the farmers and TGI.

Thus, we hold that the circuit court erred as a matter of law in denying appellants' motion for directed verdict.

## G. KBX's Counterclaims

KBX argues that the circuit court erred in granting the farmers' motion for summary judgment on its counterclaims and in ruling that "the litigation privilege applied to all of KBX's tort causes of action against the [farmers]." KBX contends that the "litigation privilege" applies only to claims of defamation.

During the litigation, KBX became aware of public, negative comments, such as "KBX is a bunch of crooks[,]" and KBX "stole their rice." In September 2017, KBX filed a counterclaim and third-party complaint asserting claims against the farmers for abuse of process, interference with contractual relationship or business expectancy, defamation, civil action by crime victim, and conspiracy. The farmers moved for summary judgment, asserting litigation privilege and lack of evidence. The circuit court granted the motion for summary judgment.

We have held that we will not consider arguments without convincing argument or citations to authority. *Seth v. St. Edward Mercy Med. Ctr.*, 375 Ark. 413, 420, 291 S.W.3d 179, 185 (2009). Here, KBX's four-sentence argument in its brief is not well developed, and notably, KBX does not mention its counterclaims in its request for relief in the brief. Thus, we hold that KBX does not present convincing argument to this court, and accordingly, we affirm the circuit court's dismissal of its counterclaims.

## III. *Attorney's Fees*

We now turn to appellants' challenge to the circuit court's award of attorney's fees. Appellants contend that the circuit court abused its discretion in awarding attorney's fees because the award was unreasonable under the circuit court's spoliation order and was excessive.

The following facts are relevant to appellants' arguments. During the course of the litigation, the farmers filed a motion for contempt, for discovery sanctions, and for a finding of spoliation, alleging that KBX had intentionally deleted cell-phone data. On June 2, 2017, the circuit court entered an order granting the farmers' motion for a finding of spoliation. The circuit court ruled that certain cell-phone data had not been recovered and entered a finding of spoliation against KBX for its intentional deletion of cell-phone data. The court stated that "[a]s a sanction for KBX, Inc.'s Spoliation of discoverable evidence," the farmers were to file "a verified and itemized statement of the [farmers'] attorney's fees, costs, and expenses incurred *as a direct result of KBX, Inc.'s deletion of the subject cell phone data*." (Emphasis added.)

On May 16, 2019, the circuit court held a hearing on the motions for a finding of spoliation against the KBX Individuals. On May 30, the circuit court entered an order granting the farmers' motion for finding of spoliation against each of the KBX Individuals for the deletion of cell-phone data. Specifically, the circuit court ruled that "[a]s a sanction for each said KBX Employees' spoliation of discoverable evidence, the [farmers] are to file . . . a verified and itemized statement of the [farmers'] attorney's fees, costs, and expenses

23

incurred *as a direct result of said KBX Employees' deletion of the subject cell phone data.*" (Emphasis added.)

Subsequently, at the conclusion of the 2020 trial, the farmers submitted their fee motion with exhibits "directly related to the spoliation and intentional destruction of documents by KBX and KBX [Individuals]" per the circuit court's orders. KBX opposed the fee motion and argued that the farmers' request was excessive, without substantive proof, and lacked the proper analysis of determining the reasonableness of requested attorney's fees and expenses. The farmers then supplemented their fee motion, increasing their request to $526,818.93.

On May 19, 2020, the circuit court summarily entered a fee judgment against KBX and the KBX Individuals for $526,818.93 as a sanction for destroying evidence. Specifically, the circuit court found:

      i. The Fee Motion and the [farmers'] Reply included verified and itemized statements as required by the 2017 Order and the 2019 Order.

      ii. The verified and itemized statements evidence attorney's fees, costs, and expenses that were incurred as a direct result of the deletion of cell phone data by KBX Inc., Steven Michael Keith, Sr., Steven Michael Keith, Jr., and Jeffrey Shay Sebree.

      iii. The total amount set out in the Fee Motion and the [farmers'] Reply is reasonable, justified, adequately supported, and compensable.

The circuit court entered a fee judgment in favor of the farmers against KBX and the KBX Individuals, jointly and severally, in the amount of $526,818.93 as a discovery sanction for

spoliation, as found by the 2017 and 2019 spoliation orders, with postjudgment interest of $144.33 per diem.

## A. Attorney's Fees as a Sanction for Discovery Violations

The imposition of sanctions for failure to comply with a discovery order is governed by Rule 37 of the Arkansas Rules of Civil Procedure, which provides in relevant part:

(4) *Expenses and Sanctions.*

> (A) If the motion is granted or if the requested discovery is provided after the motion was filed, the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them, to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the discovery without court action, or that the opposing party's response or objection was substantially justified or that other circumstances make an award of expenses unjust.

The imposition of sanctions for failure to provide discovery rests in the circuit court's discretion, and this court has repeatedly upheld the circuit court's exercise of such discretion in fashioning severe sanctions for flagrant discovery violations. *Calandro v. Parkerson*, 333 Ark. 603, 608, 970 S.W.2d 796, 799 (1998).

We agree with the circuit court's findings articulated in its 2017, 2019, and 2020 orders. Based on our standard of review, we cannot say that the circuit court abused its discretion by finding that a Rule 37 sanction was warranted for KBX's and the KBX Individuals' spoliation. Accordingly, we affirm the circuit court's award of attorney's fees as a sanction pursuant to Rule 37.

## B. Amount of Attorney's Fees

We now turn to whether the circuit court abused its discretion in awarding the amount of $526,818.93 in attorney's fees. We have explained that factors to consider in a motion for attorney's fees include (1) the experience and ability of the attorney, (2) the time and labor required to perform the legal service properly, (3) the amount involved in the case and the results obtained, (4) the novelty and difficulty of the issues involved, (5) the fee customarily charged in the locality for similar legal services, (6) whether the fee is fixed or contingent, (7) the time limitations imposed upon the client or by the circumstances, and (8) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer. *Chrisco v. Sun Indus., Inc.*, 304 Ark. 227, 229, 800 S.W.2d 717, 718–19 (1990). Because of the circuit court's intimate acquaintance with the record and the quality of service rendered, we recognize the superior perspective of the circuit court in assessing the applicable factors. *Walther v. Wilson*, 2020 Ark. 194, at 8, 600 S.W.3d 554, 559. Accordingly, the amount of the award will be reversed only if the appellant can demonstrate that the circuit court abused its discretion. *Id.* at 9, 600 S.W.3d at 559. An award of attorney's fees will not be set aside absent an abuse of discretion. *Id.*, 600 S.W.3d at 560.

From the record before us, it appears that the circuit court's award does not reflect the calculation of fees as a "direct result" of KBX's and the KBX Individuals' spoliation. Instead, the award seems to include certain fees and costs unrelated to spoliation. Thus, we hold that the circuit court abused its discretion in awarding $526,818.93 in attorney's fees

as a sanction. Upon remand, the circuit court must review the award of fees actually relating to spoliation per its 2017 and 2019 spoliation orders. Accordingly, we reverse the fee judgment and remand for a recalculation of attorney's fees.

IV. *Conclusion*

We conclude that the circuit court erroneously denied the motions for directed verdict and JNOV. We therefore reverse the judgment and dismiss as to KBX and the KBX Individuals. We also affirm the circuit court's dismissal of KBX's counterclaims. We further reverse the circuit court's fee judgment and remand the issue of attorney's fees for recalculation of an award consistent with this opinion.

Reversed and dismissed in part; affirmed in part; reversed and remanded in part.

*Hilburn & Harper, Ltd.*, by: *Ernest H. Harper, Jr.*; *James M. McHaney, Jr.*; *Randy L. Grice*; and *Kate C. Davidson*, for appellant K.B.X. Inc.

*Reece Moore McNeill Pendergraft*, by: *Paul D. McNeill*, *James Bo Renner*, and *Lisa M. Geary*, for appellants Steven Michael Keith, Sr.; Steven Michael Keith, Jr.; and Jeffrey Shay Sebree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*; *Kelly Law Firm*, by: *Jerry Kelly*; and *Campbell & Grooms, PLLC*, by: *Kendel Grooms*, *Don Campbell*, and *Parker Spaulding*, for appellees.