# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-1642
_____

Absolute Essence LLC

*Plaintiff - Appellant*

v.

Public Consulting Group LLC; Public Consulting Group Inc.; Public Consulting
Holdings Group Inc.; Veracious Investigative and Compliance Int'l LLC, doing
business as Veracious Solutions LLC, doing business as Veracious Compliance
Solutions LLC; Chad W. Westom; Samaara Yael Robbins; Does, Jane and John 1–
10

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Central
_____

Submitted: January 11, 2024
Filed: September 20, 2024
_____

Before LOKEN, KELLY, and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

Absolute Essence LLC tried to get into the medical-marijuana business, but it
could not get a license. Convinced that the process was rigged, it brought tort and

discrimination claims against the outside contractors who reviewed and scored the applications. We affirm the district court's[1] decision to dismiss.

## I.

When Arkansas legalized medical marijuana, *see* Ark. Const. amend. 98, § 3, Absolute Essence wanted to open a dispensary. Between the application process, finding a location, and working out the zoning issues, the company spent over a million dollars. The large upfront investment was worth it, in the company's view, because of the potential size of the new market and how profitable the business could be.

Unfortunately, the bet did not pay off. The first sign of trouble was the Arkansas Medical Marijuana Commission's decision to outsource the review process, *see id.* § 8(a), to a third party, Public Consulting Group, Inc., which had bid less than a third as much as the only "established and experienced" competitor. It then reviewed and scored 197 applications, each hundreds of pages long, in just two weeks. Absolute Essence received a "mediocre" score.

At that point, what happened during the review process became Absolute Essence's focus. It allegedly discovered that the scorers failed to use standardized forms, made up criteria, and changed numbers to manipulate the results. Not to mention that two of the scorers had a conflict of interest. One worked for a company that prepared some of the applications. And the other was the managing partner of a company with ties to "major players throughout the cannabis industry."

These irregularities purportedly favored "heavy-hitter organizations" and led to a racial imbalance among the licensees. Not a single "100% black-owned"

---

[1]The Honorable James M. Moody Jr., United States District Judge for the Eastern District of Arkansas.

business received one.  And of the three "nominally black-owned" licensees, two were allegedly fronts for out-of-state white-owned businesses.

These facts were the foundation of Absolute Essence's state-court lawsuit,[2] which contained four counts: tortious interference with a business expectancy, fraud, racial discrimination, and civil conspiracy.  After the defendants removed the case, the district court dismissed for failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(6).  The question for us is whether Absolute Essence pleaded enough for any of its claims to survive.

II.

We review the dismissal de novo, accepting the allegations in the complaint as true and drawing all reasonable inferences in Absolute Essence's favor.  *See FCS Advisors, LLC v. Missouri*, 929 F.3d 618, 620 (8th Cir. 2019).  "To survive a motion to dismiss, the complaint had to contain 'sufficient factual matter' to state a facially plausible claim for relief."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

A.

The tortious-interference claim lacks allegations establishing a key element: a "precise business expectancy with a specific *third party*."  *Apprentice Info. Sys., Inc. v. DataScout, LLC*, 544 S.W.3d 39, 44 (Ark. 2018) (emphasis added).  The key to the tort, as Arkansas has defined it, is to protect against "wrongful . . . intermeddling" with the business expectations of others.  *Stewart Title Guar. Co. v.*

---

[2]In a still-pending parallel case, an Arkansas trial court granted a temporary injunction stopping the Commission from issuing additional licenses. *See* Amended Order Denying Motions to Dismiss and Extending Temporary Restraining Order, *Absolute Essence, LLC v. Ark. Dep't of Fin. Admin.*, No. 60CV-22-684 (Ark. Cir. Ct. Apr. 21, 2022).

*Am. Abstract & Title Co.*, 215 S.W.3d 596, 601 (Ark. 2005) (citation omitted).  Yet the only expectancy the complaint specifically identifies is Absolute Essence's interest in having its application "fairly and thoroughly scored and ranked *by [the] [d]efendants*" (emphasis added).  The defendants, however, are not third parties and could not have interfered with themselves.  *See Apprentice Info. Sys.*, 544 S.W.3d at 43.

Gap-filling allegations in the briefs are of no help for a couple of reasons.  The first is procedural: "an[y] attempt to amend one's pleading in an appellate brief comes too late." *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 734 (8th Cir. 1993) (citation omitted); *see Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989) (making clear that a plaintiff cannot allege new facts in district-court briefing either).

The second is that to the extent the complaint, and not just the briefing, identifies retail customers as potential third parties, any expectancy with them was "subject to a contingency." *Windsong Enters., Inc. v. Upton*, 233 S.W.3d 145, 150 (Ark. 2006).  The contingency was the license: selling to the public depended on getting one. *See id.* (explaining that an expectancy includes terms that a party "knew or should have known" about).  Absolute Essence missed out, meaning the scorers "brought about the contingency" and no expectancy ever arose. *Id.* at 152; *accord Donathan v. McDill*, 800 S.W.2d 433, 434 (Ark. 1990) (rejecting a tortious-interference claim based on "causing . . . a contingency").

B.

Absolute Essence's fraud claim is also missing an element: "justifiable reliance." *SEECO, Inc. v. Hales*, 22 S.W.3d 157, 172 (Ark. 2000).  The company turned in its application about a year before the outside scorers came on board.  Given the timing, there is no way they could have induced it "to act or not to act." *MFA Mut. Ins. Co. v. Keller*, 623 S.W.2d 841, 843 (Ark. 1981).  They were simply

-4-

not part of the equation when the company spent its money locating a site, dealing with zoning issues, and preparing its application. *See id.* (explaining that the problem "is a lack of causal relation in its simplest form").

Nor can the company plausibly claim that it would have challenged the decision to bring in outside scorers. Even if the defendants duped the Commission, Absolute Essence cannot recover unless it was harmed by any misrepresentations too. *See id.* ("The maker of a fraudulent misrepresentation is not liable to one who does not rely on that misrepresentation."). Here, without allegations that it had a say over who scored the applications, it cannot link its injuries to anything the defendants said during the bidding process. *Cf. Tyson Foods, Inc. v. Davis*, 66 S.W.3d 568, 577 (Ark. 2002) (explaining that a plaintiff "would have suffered a dismissal" if he had sued after being lied to but before suffering an injury).

C.

The race-discrimination claims reflect an either/or approach. Either the defendants were private actors who violated the Arkansas Civil Rights Act, *see* Ark. Code Ann. § 16-123-107(a)(3)–(4) (prohibiting discrimination in "property" and "other contractual transactions"); or they were state actors who ran afoul of the Equal Protection Clause and federal civil-rights laws, *see* 42 U.S.C. §§ 1981, 1983.[3] A critical element is missing either way: *intentional* discrimination. *See* Ark. Code Ann. § 16-123-107(b) (creating a cause of action for "intentional act[s] of discrimination"); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory *intent* or *purpose* is required to show a violation of the Equal Protection Clause." (emphasis added)); *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 469 (8th Cir. 2009) (en banc) (explaining that § 1981

_____

[3]Absolute Essence ignores the handful of state constitutional provisions cited in its complaint, so we need not address them on appeal. *See Chay-Velasquez v. Ashcroft*, 367 F.3d 751, 756 (8th Cir. 2004).

claims require "discriminatory *intent*" (emphasis added)); *see also Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 681 (8th Cir. 2012) (noting that "[w]e analyze § 1981 claims and ACRA claims in the same manner" (citation and ellipses omitted)).

The complaint alleged, at most, that score-rigging had a racially disparate impact. It said that the number of licenses granted to "minorities" was "far fewer than their representation in the population (and the applicant pool)" and that "similarly situated white-owned applicants" were "not penalize[d]" as much as Absolute Essence. It is totally silent, however, about the number of licenses granted, the racial makeup of the applicant pool, whether the successful applicants were similarly situated, and how the scorers treated the applications differently. *See FCS Advisors*, 929 F.3d at 620 (emphasizing that pleadings need "sufficient factual matter" (quoting *Iqbal*, 556 U.S. at 678)). In short, the complaint is "flush with legal conclusions but short on facts." *DeCastro v. Hot Springs Neurology Clinic, P.A.*, 107 F.4th 813, 816 (8th Cir. 2024).

Even if the conclusory allegations were entitled to some weight, they still do not establish "a discriminatory purpose." *Gallagher v. Magner*, 619 F.3d 823, 833 (8th Cir. 2010). Although a single line accuses the defendants of "intend[ing] [the] racially discriminatory effect," the supporting facts point elsewhere. *See Iqbal*, 556 U.S. at 686. Their objective, according to the complaint, was financial in nature: "curry[ing] favor" by "steer[ing] licenses to larger industry players." Tying the injury to the "*result* of [the] [d]efendants' . . . scheme" (emphasis added), rather than its purpose, further suggests an alternative motive and makes a race-discrimination claim *less* "plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see FCS Advisors*, 929 F.3d at 622 (holding that a § 1981 claim was "implausible" because the "complaint identifie[d] independent non-discriminatory reasons for [the defendant's] actions").

D.

Finally, with its other claims dismissed, Absolute Essence's civil-conspiracy claim cannot stand on its own. *See Varner v. Peterson Farms*, 371 F.3d 1011, 1016 (8th Cir. 2004) (noting that "civil conspiracy . . . is not a separate tort and must be based on . . . underlying tort[i]ous activity"). Without an underlying tort, there can be no conspiracy. *KBX, Inc. v. Zero Grade Farms*, 639 S.W.3d 352, 364 (Ark. 2022).

III.

We accordingly affirm the judgment of the district court.

_____